**UNITED STATES of America, Appellee,**

v.

**Carl E. BROWN, Appellant.**

**No. 76–2017.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1977.

Decided April 1, 1977.

Rehearing and Rehearing En Banc Denied April 19, 1977.

Certiorari Denied May 31, 1977. See 97 S.Ct. 2666.

---

William W. Essling, St. Paul, Minn., for appellant.

Steven G. Thorne, Sp. Asst. Atty. Gen., Dept. of Natural Resources, St. Paul, Minn., for amicus curiae; Warren R. Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., Philip J. Olfelt, Asst. Atty. Gen., St. Paul, Minn., on brief.

Robert G. Renner, U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY and STEPHENSON, Circuit Judges, and SMITH,* Senior District Judge.

STEPHENSON, Circuit Judge.

Carl E. Brown appeals from his conviction for violation of National Park Regulations prohibiting possession of a loaded firearm and hunting in national parks. The issue presented in this appeal is whether the United States has jurisdiction to enforce regulations controlling activities on waters within the boundaries of Voyageurs National Park. For the reasons stated below, we affirm.

The facts are undisputed. On October 7, 1975, Carl E. Brown went duck hunting within the boundaries of Voyageurs National Park in northern Minnesota. While his boat was afloat on a portion of Rainy Lake known as Black Bay, Brown was served with a citation for violations of National Park Service regulations prohibiting possession of a loaded firearm and hunting of wildlife in national parks. 36 C.F.R. §§ 2.11 and 2.32. Brown concedes that he was hunting ducks on water within the park. At the time and place of the violations, duck hunting by licensed hunters was permitted under state law.[1] There has been no showing that Brown did not have a valid state hunting license in his possession.

Pursuant to 18 U.S.C. § 3401, Brown consented to be tried by a United States Magistrate but filed a motion to dismiss stating that the United States does not have jurisdiction over the waters in Voyageurs National Park. He contended that the state of Minnesota had deeded the lands within the park boundaries to the federal government but the state had not relinquished ownership of the waters. After a hearing the magistrate denied the motion to dismiss, determined that Brown was guilty and sentenced him to pay fines of $50 and $100 for violation of section 2.11 and section 2.32 respectively. The magistrate found that the federal government and the state had worked in concert to establish Voyaguers National Park. The magistrate made no precise finding relative to the actual ownership of the waters within the park boundaries but concluded, nonetheless, that the state had ceded concurrent jurisdiction over the waters to the United States.

Brown subsequently appealed his conviction to the district court,[2] in order to obtain reconsideration of the jurisdictional issue. See Fed.R.P. for the Trial of Minor Offenses Before United States Magistrates 8(a). The state of Minnesota was allowed

---

* The Honorable Talbot Smith, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.

1. See Order of the Minnesota Commissioner of Natural Resources No. 1932 (August 20, 1975); Order No. 1935 (September 8, 1975); Order No. 1947 (August 8, 1976). The state of Minnesota has prohibited hunting and trapping in Voyageurs National Park with the exception of waters in a portion of Black Bay on Rainy Lake. Although the state has not yet indicated any intention to allow hunting in other areas in the park, future policy is of course uncertain.

2. The Honorable Miles W. Lord, United States District Judge for the District of Minnesota.

to participate as amicus curiae because of its contention that the federal government does not have jurisdiction over the public navigable waters within Voyageurs National Park. The district court found that the state of Minnesota had not ceded jurisdiction over the "waters" to the United States but had only granted concurrent jurisdiction over the "lands" acquired by the federal government. Nevertheless, the district court concluded that the Property Clause of the Constitution provides congressional power to prohibit hunting and possession of loaded firearms within the boundaries of the national park. Brown's conviction was affirmed on that basis, and this appeal followed.

The threshold question to be considered is whether the state of Minnesota ceded jurisdiction over the waters within Voyageurs National Park to the United States.[3] There are approximately 139,000 acres of land and 80,000 acres of water inside the park's boundaries. The congressional intention to exercise regulatory jurisdiction over the waters in the park is clearly demonstrated in the Voyageurs National Park Act. 16 U.S.C. § 160 *et seq.* The Act provides:

The purpose of sections 160 to 160k of this title is to preserve, for the inspiration and enjoyment of present and future generations, the outstanding scenery, geological conditions, *and waterway system* which constituted a part of the historic route of the Voyageurs who contributed significantly to the opening of the Northwestern United States.

\* \* \* \* \* \*

The park shall include the lands *and waters* within the boundaries as generally depicted on the drawing entitled "A Proposed Voyageurs National Park, Minnesota," numbered LNPMW–VOYA–1001, dated February 1969, which shall be on file and available for public inspection in the offices of the National Park Service, Department of the Interior.

16 U.S.C. §§ 160, 160a (emphasis added).

Furthermore, the legislative history of the Act shows the congressional intention to include 139,000 acres of land and 80,000 acres of water within the perimeter of the park. S.Rep.No.1513, 91st Cong., 2nd Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, p. 5965. The Committee on Interior and Insular Affairs acknowledged that "Taken together, these lakes and the network of connecting waterways make this area a unique and beautiful setting for a national park." *Id.* According to the committee, the Secretary of the Interior was not authorized to establish the park until "he deems sufficient interest in the lands and waters within the park have been acquired for administration in accordance with the act." *Id.* at 5967.

Congress can acquire exclusive or partial jurisdiction over lands or waters within a state by the state's consent or cession. U.S.Const. art. I, § 8, cl. 17. *See Paul v. United States*, 371 U.S. 245, 264, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 541–42, 5 S.Ct. 995, 29 L.Ed. 264 (1885); *Petersen v. United States*, 191 F.2d 154, 156–57 (9th Cir.), *cert. denied sub nom, California v. United States*, 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664 (1951). As recognized by the district court, however, it is improper to assume that a state has relinquished its sovereignty. *See Colorado v. Toll*, 268 U.S. 228, 231, 45 S.Ct. 505, 69 L.Ed. 927 (1925). In this case, it is not abundantly clear that the state of Minnesota ceded jurisdiction over the waters in the park to the United States. *See* Minn.Stat.Ann. §§ 84B.01 *et seq.* The state's enabling legislation in section 84B.06 ostensibly consents to federal acquisition and concurrent jurisdiction only over the lands within the park.

3. The waters in question are located within the park boundaries but are owned by the state of Minnesota. The deed by which the state conveyed the lands in the park to the United States expressly reserved "all water power rights" to the state. The place where Brown was hunting is available by water from outside the boundaries of the park without entering upon the lands of the United States.

Nonetheless, the state of Minnesota was an active participant in the creation of Voyageurs National Park, passed enabling legislation and otherwise encouraged the development of the park. Minn.Stat.Ann. §§ 84B.01 *et seq.* In section 84B.01 the enabling legislation expresses that:

\* \* \* \* \* \*

\* \* \* The legislature concurs with the stated purpose of Congress in authorizing the establishment of the park. It is, therefore, the purpose of sections 84B.01 to 84B.10 to preserve, for the inspiration and enjoyment of present and future generations, the outstanding scenery, geologic conditions *and waterway system* which constituted a part of the historic route of the voyageurs, who contributed significantly to the opening of the northwestern United States.

\* \* \* Sections 84B.01 to 84B.10 are a necessary first step in the establishment of the park and is in furtherance of the provisions of section 101 of the act of Congress authorizing the establishment of the park.

(emphasis added.) The enabling legislation's broad policy expression in section 84B.01 evinces the state's intention to embrace the federal act and implicitly if not expressly refers to both lands and waters.

■ Although the state of Minnesota did not expressly cede jurisdiction over the waters in the park to the United States, the state did consent to the creation of the park with the knowledge that the federal government intended to prohibit hunting within the boundaries of the park.[4] The House and Senate bills creating Voyageurs National Park originally contained distinct provisions allowing water fowl hunting and trapping in accordance with the applicable state laws. S.Rep.No.1513, 91st Cong., 2nd Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 5965, 5972. In light of objections to such provisions by the Secre-

tary of the Interior and the Secretary of Agriculture, however, the bills in both the House and Senate were amended to delete any hunting privileges. *Id.* at 5975, 5979–81. Moreover, in hearings related to the creation of Voyageurs Park various congressmen expressed their intention that hunting would not be allowed in a national park under any circumstances. *See* 116 Cong.Rec. 34801, 34803–06 (1970); *Hearings Before the Subcommittee on National Parks and Recreation of the Committee on Interior and Insular Affairs, House of Representatives on H.Rep. 10482,* 91st Cong., 2nd Sess. 359, 366–67 (statements of Representatives Taylor and Udall). The intent of Congress, as the district court found, should have been clear to the state of Minnesota. Correspondingly, the state's active participation in the creation of Voyageurs Park with the knowledge that Congress intended that hunting would be prohibited throughout the park was tantamount to a cession of jurisdiction over the lands and the waters within the park boundaries.

■ Assuming arguendo that the state did not cede jurisdiction over the waters in the park, we further conclude that the federal regulations prohibiting hunting in Voyageurs Park were a constitutional exercise of congressional power under the Property Clause.[5]

The Property Clause of the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S.Const. art. IV, § 3, cl. 2. When Congress acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause. U.S.Const. art. VI, cl. 2.

The Supreme Court has most recently examined the scope of the Property Clause in *Kleppe v. New Mexico,* 426 U.S. 529, 96

---

4. The federal legislation was enacted January 8, 1971; the Minnesota legislation was enacted afterwards.

5. The presence or absence of federal jurisdiction obtained through a state's consent or ces-

sion is unrelated to Congress' powers under the Property Clause. *Kleppe v. New Mexico,* 426 U.S. 529, 542–43, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

S.Ct. 2285, 49 L.Ed.2d 34 (1976). In *Kleppe* the Court held that a federal act designed to protect horses and burros on public lands was a constitutional exercise of congressional power under the Property Clause to the extent it was applied to prohibit a state agency from entering on lands of the United States and removing wild burros pursuant to state law. Again assuming the state did not cede jurisdiction over the waters to the federal government, the instant case presents the question left open in *Kleppe:* whether the Property Clause empowers the United States to enact regulatory legislation protecting federal lands from interference occurring on non-federal public lands, or, in this instance, waters.

■ Under normal circumstances protective legislation is necessary only to control disruptions occurring on federal lands. *See, e.g., Hunt v. United States,* 278 U.S. 96, 99–101, 49 S.Ct. 38, 73 L.Ed. 200 (1928). But the Court's decision in *Kleppe* recognizes that when regulation is for the protection of federal property, "the Property Clause is broad enough to reach beyond territorial limits." 426 U.S. at 538, 96 S.Ct. at 2291. For example, the Supreme Court in *Camfield v. United States,* 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), held that the Property Clause permits federal regulation of fences built on private land adjoining public land.

■ The crucial question is whether federal regulations can be deemed "needful" prescriptions "respecting" the public lands. This determination is primarily entrusted to the judgment of Congress, and courts exercising judicial review have supported an expansive reading of the Property Clause. *See United States v. San Francisco,* 310 U.S. 16, 28–30, 60 S.Ct. 749, 84 L.Ed. 1050 (1940). In light of these general standards, we view the congressional power over federal lands to include the authority to regulate activities on non-federal public waters in order to protect wildlife and visitors on the lands. *See Kleppe v. New Mexico, supra,* 426 U.S. at 540–41, 96 S.Ct. 2285.[6]

In this instance the district court determined that hunting on the waters in the park could "significantly interfere with the use of the park and the purpose for which it was established." The district court found that because duck hunting occurs in close proximity to adjacent lands, there is potential danger of unwarranted intrusion on public lands, injury to park users, and disruption of wildlife migration patterns. *Cf. Hunt v. United States,* 278 U.S. 96, 99–101, 49 S.Ct. 38, 73 L.Ed. 200 (1928); *United States v. Alford,* 274 U.S. 264, 266–67, 47 S.Ct. 597, 71 L.Ed. 1040 (1927); *McKelvey v. United States,* 260 U.S. 353, 359, 43 S.Ct. 132, 67 L.Ed. 301 (1922). The court observed that public lands adjacent to the water areas could be exposed to uses, such as hunting, which are expressly proscribed on federal lands within national parks.

■ In *Camfield v. United States, supra,* 167 U.S. at 525, 17 S.Ct. at 867, the Supreme Court emphasized that "[t]he general Government doubtless has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case." The National Park Service Act allows the Secretary of the Interior to promulgate "such rules and regulations as he may deem necessary or proper for the use and management of the parks." 16 U.S.C. § 3.[7] The regulations prohibiting hunting and possession of a loaded firearm were promulgated pursuant to that authority, 36 C.F.R. §§ 2.11 and 2.32, and are valid prescriptions designed to promote the purposes of the federal lands

---

**6.** Before the district court, the United States also contended the regulations were a valid exercise of the treaty power and the commerce power. Our holding renders unnecessary any discussion of the applicability of these congressional powers.

**7.** The fundamental purpose of national parks, including Voyageurs Park, is to "conserve the scenery and the natural historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. *See also* 16 U.S.C. § 160.

within the national park.[8] Under the Supremacy Clause the federal law overrides the conflicting state law allowing hunting within the park.

Affirmed.

See also, D.C., 418 F.Supp. 591.

8. Contrary to various contentions by appellant that the regulations prohibiting hunting are unenforceable, these regulations are a proper delegation of congressional authority and founded upon a rational basis. *See United States v. Cassiagnol,* 420 F.2d 868, 872–77 (4th Cir.), *cert. denied,* 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970); *Udall v. Washington, Virginia and Maryland Coach Co.,* 130 U.S.App. D.C. 171, 398 F.2d 765, 769–70 (1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). Such regulations, which are not overbroad or vague, cannot be invalidated merely because they are penal in nature. *See United States v. Grimaud,* 220 U.S. 506, 521, 31 S.Ct. 480, 55 L.Ed. 563 (1911); *United States v. Cassiagnol, supra,* 420 F.2d at 872–77.