**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Jerry C. RICHARD, Defendant-Appellee.**

**No. 80–1342.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 8, 1980.

Decided Dec. 24, 1980.

---

Michael A. Jones, Asst. U. S. Atty., Springfield, Mo., for plaintiff-appellant.

Ray Conrad, Asst. Federal Public Defender, Springfield, Mo., for defendant-appellee.

Before HENLEY and McMILLIAN, Circuit Judges, and VAN PELT, Senior District Judge *.

PER CURIAM.

The United States of America appeals an order of the United States District Court for the Western District of Missouri reversing defendant Jerry C. Richard's conviction by a magistrate after a consolidated trial on two separate informations charging him with conducting a business enterprise in a National Forest System without first obtaining a permit to do so in violation of 36 C.F.R. §§ 261.2(h) and 261.10(c) and 16 U.S.C. §§ 551, 1277(e) and 1281(d). The magistrate had imposed concurrent sentences of 90 days confinement, with execution of the sentences suspended and placed the defendant on probation for two years. The district court reversed the magistrate's findings in a brief two-page Order relying solely on an unpublished slip opinion entitled *United States v. Irby Williams,* Case No. 76–225 CR (1) (E.D.Mo. Nov. 24, 1976). The basic issues on this appeal are (1) whether the district court erred in relying on *Williams, supra*; and (2) whether the defendant's conduct is subject to regulation by the United States. For the reasons stated below, we reverse the district court and remand with directions to vacate the order appealed from, affirm the magistrate's opinion in its entirety, and reinstate the judgment and sentence.

The facts are simple and undisputed. We will state them briefly. Defendant operates a recreational campground on private land located near Mark Twain National Forest (hereinafter referred to as "the Forest"). As a part of defendant's business, he operates a canoe outfitting service known as Richard's Canoe Rental. These canoes are used on Eleven Point River, which is within the boundaries of the Forest. Outside his place of business defendant has a sign which states that the canoe rental fee is $15 "if you haul or I haul."

The informations were filed in this case as a result of canoe rentals on May 1 and 2, 1979 (No. 79–0068–01–P–S–E) and May 27, 1979 (No. 79–0084–01–P–S–E).

The alleged violations on May 1 and 2 involved four canoes rented to a party of eight men. The men were camped within the Forest boundaries at Greer's Landing when the defendant, who had been swimming in the area, approached them and informed them of his services including canoe rental. The magistrate found that it was not clear where the money had changed hands, but that some negotiation had occurred at Greer's Landing, and some had occurred at Richard's place of business the following day. The outcome of the

---

* Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

negotiations was apparently successful as Richard rented the canoes for $15 apiece for the first day and $10 apiece for the second day. On May 1 the men and the canoes were transported by the defendant to Cane Bluff where the canoes were launched from a boat ramp. They ended the first day's float at Turner's Mill where they were picked up by the defendant and taken back to their campsite. The next day, May 2, the defendant brought the canoes to Greer's Landing where they were launched from the boat ramp. The canoes and men were picked up at a gravel bar at Riverton by defendant, and the men were again taken back to their campsite.

On May 25, 1980, a group of 18 people went to Richard's campground. On May 26, six canoes were rented. Two of the 18 people had their own canoes. Richard transported the six rented canoes and the two privately owned canoes to Cane Bluff where they were launched from the boat ramp. Defendant charged a fee for transporting the privately owned canoes. The group floated as far as Turner's Mill and all 18 were picked up there by defendant and an employee and taken back to his campground. On May 27, all 18 persons were taken back to Turner's Mill with the eight canoes which were launched at the boat ramp and the group floated to Riverton where they were taken out on the gravel bar by a young couple employed by defendant and taken back to the campsite.

Cane Bluff, Greer's Landing, Turner's Mill and Riverton are all a part of the Eleven Point River, which is a part of the National Wild and Scenic Rivers System. See 16 U.S.C. § 1274(a)(2). All of the roads leading to Eleven Point River, and more specifically Cane Bluff, Greer's Landing,

Turner's Mill and Riverton are owned and maintained by the Forest Service, as are all of the boat ramps and docks. The National Forest System includes all lands and waters acquired under the Wild and Scenic River Act. 36 C.F.R. § 261.2(h). All uses of national forest lands are designated "special uses" which require "special use permits" unless such use is temporary by an individual for camping, hiking, fishing, boating, etc. However,

> [s]elling or offering for sale any merchandise, conducting any kind of business enterprise or performing any kind of work unless authorized by Federal law, regulation, or permit

is strictly prohibited. 36 C.F.R. § 261.10(c).

The defendant did not have a permit to operate a canoe outfitting business on Eleven Point River. He was not unaware of the fact that a permit system had been initiated in 1978 at the Forest.[1] In 1978 he had plead guilty to a two count information charging him in Count I with conducting a business enterprise on or about May 31, 1978 without a permit, and in Count II with unlawfully and knowingly threatening, resisting, intimidating and interfering with a Forest Service Officer engaged in his duties on or about June 11, 1978. He had been fined $125 on each count. Prior to sentencing, the defendant and the Forest Service worked out an agreement whereby defendant would be issued a 1978 permit for $25 and in return would sign such permit and agree to all its terms and conditions.[2] The 1978 permit issued to defendant expired, and after several unsuccessful attempts to contact defendant, the Service terminated his permit for non-payment of the 1979 permit fee.[3]

---

1. At the time the permit system was initiated there were three canoe outfitters operating in the vicinity of the Forest. The number of such permits to be issued was frozen at three to accommodate all currently operating outfitters.

2. The terms and conditions involve several things, including maintaining a policy of insurance with the government being named as a co-insured, and having certain markings and numbers at specified places and of specified length and height on each canoe so that they

can be readily identified by Forest Service Personnel in case of an emergency.

3. Defendant left in December for Texas and did not return until April 9. Three bills for the 1979 permit fee were mailed to defendant. The first bill was sent in November, before defendant left for Texas. Two later bills were sent by certified mail and returned marked unclaimed. Newspaper ads were placed in the local paper indicating that special use permits would be terminated if the fees were not paid. These ads

Defendant has argued that (1) his business is headquartered on private property and he is not conducting business on government property; (2) since he does not charge a fee for hauling the canoes, but only for renting them, his business does not involve government owned property, and (3) because the Forest Service roads and boat ramps are open to the public, he is entitled to use them regardless of whether he is doing so in the course of his business.

In an excellent well-written opinion, the magistrate found that:

> If an interpretation of the regulation were to be as restrictive as the defendant urges, the entire purpose of the regulation would be defeated. An individual could bypass all the requirements that are part of the special use permit simply by storing his canoes outside the Forest Service boundaries and hauling them on the Forest Service land after the negotiations had been completed. In addition, the Congressional intent evidenced in the statutory schemes discussed earlier, that is, allowing the Secretary to control the occupancy and use of this land, would be substantially diminished, if not defeated.

The only reason given by the district court in this case for reversing the magistrate's findings was that:

> The facts before this Court are indistinguishable from the facts before Judge Meredith in *Williams, supra*. Accordingly, for the reasons set forth in Judge Meredith's opinion, this Court adopts the *Williams, supra*, holding as the controlling law in these cases.

We conclude that the two cases are distinguishable, and that the district court erred. In *Williams, supra*, the defendant was operating a canoe rental business out-side the boundaries of the Ozark National Scenic Riverways. He did not charge a fee for hauling the canoes to the river. The case was submitted on a stipulation of facts. It was stipulated that the persons involved would not have rented the canoe had the hauling not been included in the fee. In the particular instance complained of, Williams had his son take the people and canoe to Alley Springs on the Jacks Fork River where the canoe was placed at the water's edge. It was stipulated that:

> The area known as Alley Springs is located at a point where Missouri State Highway 106 intersects and crosses over the Jacks Fork River and lies within the boundaries of Ozark National Scenic Riverways. This is an area controlled and administered by the National Park Service, the United States Department of the Interior. A state highway easement exists at the location and extends for a number of feet on both sides of Missouri State Highway 106. At all times relevant and material to this action during the unloading of the canoe and associated equipment, Mark Williams and the vehicle he was operating were physically upon the land lying within the state highway easement.

The defendant Williams had no permit to engage in any commercial activity within Ozark National Scenic Riverways. The *Williams* court held that:

> the United States Government has no authority to prohibit persons from delivering or retrieving canoes from the water on a public road at a point where that public road crosses a river within the park boundary, as long as this is done without charge, even though the action may be an adjunct to a business operation.

were specifically for the defendant's benefit, since the other two canoe outfitters had already paid the fees. A Forest Service employee contacted both defendant's relatives and defendant's attorney in an attempt to obtain his address. The provisions of the permit specifically stated that the person holding the permit was not to change his address without notifying the Service. The defendant indicated at the trial that he was aware of that provision of the permit, that he had not changed his address but had simply not picked up his mail from December until his return April 9. However, defendant did admit that he was aware that the permit fee was to be paid January 1. At the time the termination letter was personally delivered to defendant on April 17, he stated he would continue launching boats at Eleven Point River, which is exactly what happened.

Williams was found not guilty of the charge that he had engaged in a commercial activity within the Ozark National Scenic Riverways.

Comparing the two cases, there is more reason to believe that Richard was engaging in commercial activity on Forest property than that Williams was so engaged. With respect to the May 1 and May 2 incidents, the persons rented canoes from Richard after he had approached them while they were camped within the Forest. There was testimony that they had intended to rent from one of the other outfitters until Richard approached them and informed them of his services. The magistrate found that some negotiation had occurred in the Forest. There is no similar circumstance involved in *Williams, supra.*

In *Williams, supra,* it was stipulated that no charge was made for hauling the canoes. There is no such stipulation in this case. The facts show that while Richard claims there is no charge for hauling the canoes he rents, some of the persons thought that it was a part of what they were paying for. More importantly, there is no denying with regard to the May 27 canoe rentals, where two parties had their own privately owned canoes, that the defendant *did* charge them a fee for hauling their canoes to the Forest launch site.

Finally, we do not believe that Forest owned and Forest maintained roads, boat ramps and docks, and other Forest property, even though available for public use, is the equivalent of the *Williams* situation where the canoe was put into the water from land covered by a state highway easement.

The government raises a question as to whether the November, 1976 *Williams* opinion "is either valid precedent in this case or substantively accurate" in light of later decisions such as *United States v. Brown,* 552 F.2d 817 (8th Cir.) *cert. denied* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977) and *United States v. Lindsey,* 595 F.2d 5 (9th Cir. 1979). Both of these cases indicate that federal regulation may exceed federal boundaries when necessary for the protection of human life or wildlife or government forest land or objectives.[4] The *Williams* case was never appealed to this court

4. In *Brown, supra,* the defendant went duck hunting on a lake within the boundaries of a National Park. There was no hunting within the park. The defense was that the state had deeded the land within the park boundaries to the federal government, but that the state had not relinquished ownership of the waters. A panel for this Circuit found that:

> Although the state of Minnesota did not expressly cede jurisdiction over the waters in the park to the United States, the state did consent to the creation of the park with the knowledge that the federal government intended to prohibit hunting within the boundaries of the park. . . .
>
> Assuming arguendo that the state did not cede jurisdiction over the waters in the park, we further conclude that the federal regulations prohibiting hunting in Voyageurs Park were a constitutional exercise of congressional power under the Property Clause.

*Id.* at 821. Following an examination of various cases, our Circuit panel further concluded:

> [C]ourts exercising judicial review have supported an expansive reading of the Property Clause. *See United States v. San Francisco,* 310 U.S. 16, 28–30, 60 S.Ct. 749, [755] 84 L.Ed. 1050 (1940). In light of these general standards, we view the congressional power over federal lands to include the authority to regulate activities on non-federal public

waters in order to protect wildlife and visitors on the lands. *See Kleppe v. New Mexico, supra,* 426 U.S. [529] at 540–41, 96 S.Ct. 2285 [at 2292, 49 L.Ed.2d 34].

*Id.* at 822.

In *Lindsey, supra,* defendants built a fire at a campsite on a riverbed that was technically a part of the State of Idaho, but was surrounded on either side by land designated a part of the Wild and Scenic River System. They were convicted of violating regulations which prohibited camping and building a fire without permits. The Ninth Circuit held:

> The fact that title to the land on which the violations occurred was in the state of Idaho does not deprive the United States of regulatory control over appellees' conduct. Article IV, Section 3, Clause 2 of the United States Constitution provides in part:
>
> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting Territory or other Property belonging to the United States.
>
> It is well established that this clause grants to the United States power to regulate conduct on non-federal land when reasonably necessary to protect adjacent federal property or navigable waters.

*Id.* at 6.

and is not before us now, since we find the two cases distinguishable. However, we would say that any court now or hereafter faced with a situation similar to that in *Williams, supra*, should examine the later case law. This was not done here. We believe later case law, as well as earlier case law, see *United States v. Carter*, 339 F.Supp. 1394 (D.Ariz.1972)[5] supports the result we reach in this case.

The case is reversed and remanded for further proceedings in accord with this opinion.

---

**5.** *Carter, supra*, was cited by the magistrate in his decision. It involved similar facts. Defendant rented boats for use on Lake Powell which was within the Glen Canyon National Recreation Area. He also provided a guide service for the public on fishing and sightseeing trips on Lake Powell. There was only one launching site in the area, Wahweap Landing. It was open to the public. Defendant's boat rental service included launching the boats at Wahweap Landing. Defendant did not have a permit, despite efforts to obtain one. The court noted that in order for the defendant to provide his service,

> he must always carry his boats over government owned recreation area land to the Wah-

weap launching site at the edge of Lake Powell. . . . The Court agrees with the Government's argument that the fact defendant must enter into the recreation area and use the facilities provided by the Government as a prerequisite to fulfilling his obligation to his customers (whether the activity involved is merely launching a rented boat on Lake Powell for the customer's personal use or the launching of a guide boat to be piloted by defendant's agents) is sufficient to constitute engaging in business within the recreation area . . . .

*Id.* at 1397.