549 F.Supp. 252 (1982)
FREE ENTERPRISE CANOE RENTERS ASSOCIATION OF MISSOURI, Plaintiff,
v.
James WATT, Secretary of Interior, et al., Defendants.
UNITED STATES of America, Plaintiff,
v.
Jack PETERS, et al., Defendants.
Nos. 82-340C(2), 82-60CR(2).
United States District Court, E.D. Missouri, E.D.
October 8, 1982.
*253 Alan C. Kohn, Kohn, Shands, Elbert, Gianoulakis & Giljum, St. Louis, Mo., for plaintiff in 82-340C(2) and for defendant in 82-60CR(2).
Jim Crowe, Jr., Asst. U.S. Atty., St. Louis, Mo., for defendant in 82-340C(2) and for plaintiff in 82-60CR(2).

MEMORANDUM
NANGLE, District Judge.
Plaintiff, Free Enterprise Canoe Renters Association of Missouri, instituted this action for the purpose of enjoining the enforcement of a federal regulation which prohibits activities associated with the commercial rental of canoes within the boundaries of the Ozark National Scenic Riverways, unless the businesses obtain a permit from the National Park Services. The regulation *254 explicitly precludes "[t]he delivery or retrieval within the boundaries of Ozark National Riverways of watercraft or associated equipment which has been rented to a member or members of the public at a location not within the Riverways ... whether or not any charge, either separately or in combination with any other charge, is made for these services." 36 C.F.R. § 7.83(c)(3).[1] The Free Enterprise Canoes Association of Missouri alleges that its activities are in compliance with the federal law and regulations; and therefore the National Park Services does not have the authority to prohibit its commercial activities within the park, because members of the association deliver and retrieve their canoes on public roads within the Ozark National Scenic Riverways, and do not levy a separate charge for hauling. Furthermore, the plaintiff insists that its reasonable reliance on the laws, as construed by the court in United States v. Irby Williams[2] precludes the conviction of certain of its members for criminal charges brought as a result of any violation of 36 C.F.R. § 7.83(c)(3).[3]
This case was tried to the court sitting without a jury. The court having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

*255 FINDINGS OF FACT
1. The Ozark National Scenic Riverways (hereinafter the "Riverways"), are located in southeast Missouri, and are managed and administered by the National Park Service (hereinafter "NPS"). The NPS is part of the Department of Interior.
2. The defendants, in the civil action, are duly appointed officers, agents and employees of the United States government within the Department of the Interior. In particular, James Watt is the Secretary of Interior, Ray Arnett is the Assistant Secretary of the Interior, Jimmy Dunning is the Regional Director of the NPS, and Arthur Sullivan is the NPS Executive serving as the Superintendent of the Riverways.
3. The Free Enterprise Canoe Renters Association (hereinafter the "Association"), plaintiff in the civil action, is an unincorporated not-for-profit association of persons operating fourteen canoe rental businesses which are located near, but outside the boundaries of the Riverways. Tom Beddleton, Willard Burkhart and Clinton Jadwin are members of the Association.
4. The Association, through its members, has instituted this civil action for the purpose of enjoining the enforcement of a federal regulation which was promulgated to bar the conduct of commercial canoe rental activities within the boundaries of the Riverways, unless the commercial activity is authorized pursuant to a permit or contract with the NPS. None of the members of the Association have acquired this type of permit or contract.
5. The United States issued the defendants in the criminal action petty offense citations, alleging violations of Regulation 7.83(c)(3). Each of the defendants, Peters, Bedell, Middleton, Burkhart and Jadwin are charged with conducting commercial activities within the boundaries of the Riverways without a permit, contract, or written agreement with the United States. The specific activities which led to the issuance of the citations consisted of the delivery or retrieval of rented canoes within the Riverways boundaries and occurred in early October, 1981.
6. Creation of the Riverways was authorized by Congress in 1964. Act of August 27, 1964, 88th Cong., P.L. 88-492, 78 Stat. 608, Title 16, United States Code, Section 460m, et seq. At this time, the government began acquiring lands and began its management of the Riverways. On June 16, 1972 the Riverways was deemed an administrable unit. 16 U.S.C. § 460m-3.
7. The Riverways is approximately a 140 mile long, narrow and noncontinuous strip of land bordering the Current and Jacks Fork Rivers. It is located in Dent, Shannon, Carter and Texas Counties, Missouri. The Riverways extends from Montauk State Park in Dent County to the Ripley County line, with respect to the Current River. It also extends from 2 miles west of the Highway 17 bridge to the junction of the Current River, with respect to the Jacks Fork River.
8. Of the lands falling within the Riverways, approximately 51,500 acres are federally owned, 14,000 acres are state owned and 6,400 acres are privately owned.
9. In 1971 the Missouri legislature ceded "[j]urisdiction concurrent with that of the State of Missouri to the United States within the area comprising the `Ozark National Scenic Riverways' for so long as this area is administered and maintained by the United States." Section 12.025(2), R.S.Mo.1969 (Laws of Missouri (1971) p. 112.) Prior to that date, in July of 1969, the State of Missouri authorized the conveyance of Alley Spring State Park, Big Spring State Park and Round Spring State Park to the United States, through the NPS; the sale was "conditioned upon the commencement of a development program for such land ... and its continued use as a National Scenic Park." Laws of Missouri (1969) pp. 376-377.
10. Pursuant to the mandate of Congress which established the Riverways "[f]or the purpose of conserving and interpreting unique, scenic and other natural values and objects of historic interest, including preservation of portions of the Current River and the Jacks Fork River in *256 Missouri as free-flow streams, preservation of springs and caves, management of wildlife, and provisions for use and enjoyment of the outdoor recreation resources thereof...." the government has expended funds to develop and improve the Riverways. 16 U.S.C. § 460m. The principal recreational activity on the Current and Jacks Fork Rivers is canoeing. Therefore, expenditures have included funds for the building of roads, boat launch ramps and sewage treatment facilities at major access points in the rivers. Presently there are eight primary access points to the rivers; approximately seventy-five percent of the canoes are delivered and retrieved within the Riverways at these access points. The NPS has built roads at certain of these access points and has maintained virtually all the state and county roads leading to the access roads for the past ten years.
11. Presently, there are seventeen canoe rental businesses which hold concession permits or have contracts with the NPS. These contracts or permits authorize the concessioners, some of which are located in the Riverways, to conduct commercial canoe rental activities within the boundaries of the Riverways. As a general rule, these businesses provide for the rental of canoes, in addition to the delivery and retrieval of the canoes to and from the access points on the rivers. The NPS sets the maximum rates that its concessioners may charge for canoe rentals. The agency also authorizes "haul" fees which vary according to the distance the canoe is delivered. Finally, pursuant to the written agreements between the concessioners and the United States, NPS requires concessioners to pay a franchise fee, submit financial statements, acquire liability insurance and conform their operations to the safety and performance standards set by the NPS. Mr. Sullivan, the Park Superintendent testified that the NPS implemented these controls over the concessioners for the purpose of ensuring the safety of the public and regulating the number of canoes on the rivers.
12. On or about 1970, the NPS extended special use permits to the sixteen canoe rental businesses then doing business in the Current-Jacks Fork River Area. In 1972 a seventeenth special use permit was granted to another business. The original permits were awarded without any public notification. Subsequently, in 1973, after officials of the NPS notified the Superintendent of the Riverways that special use permits were not appropriate for canoe concessioners, the canoe rental businesses were awarded actual concession permits. These permits were issued without notice for a term of three years. By law, the holders of the original concession permits are given preference in the renewal of their contracts or permits. 16 U.S.C. § 20d. However, the NPS is required to make public notice of its intention to renew concession permits. Upon the expiration of the various concessioners' permits, the NPS did in fact notify the public. Mr. Sullivan testified that the agency did not receive any opposition to the renewal of the various concessioners' permits over the years.
13. The NPS must approve any transfer of a permit. Several transfers have taken place since 1970, when the NPS first awarded canoe rental businesses permits to operate in the Riverways. Mr. Derryl Blackwell testified that some of these transfers have been to the original seventeen canoe rental businesses located in the Riverways, while other sales have been to businesses that were not given permits by the NPS in 1970 or 1973. Mr. Sullivan testified that the reassignment of a permit was approved only if the prospective buyer was able to assume the responsibilities of the written operation plan.
14. Since 1973, the total number of canoe concession authorizations allowed by the NPS for the Riverways has remained at seventeen. As a matter of policy the NPS determined in 1970 that no additional permits would be issued pending the outcome of a study of the Riverways.
15. In addition to controlling the traffic upon the Riverways by limiting the number of concession permits and contracts, the NPS also imposed limitations on the concessioned canoe rental businesses by limiting *257 the number of canoes that each business may rent. As of 1972, the total number of canoes available for rental by the seventeen concessioners was 839. In that year, in addition to placing a moratorium on the issuance of additional concession permits, the NPS refused to further increase the number of canoes available for rental by the permitted concessioners, pending a study of the Riverways. In both 1977 and 1979 a temporary increase of 25 canoes per business was allowed to each of the seventeen concessioners, raising the number of available concessioned canoes to its present total of 1,719. Mr. Sullivan testified that the permittees understood that these increases were of a temporary nature. The Superintendent further testified that these increases were necessary to the continued operation of the permitted concessioners in light of the increasing competition from non-concessioned canoe rental businesses. In the period of 1972 to the present, various individual concessioners and the concessioners' association, the Current and Jacks Fork Rivers Canoe Rental Association, requested additional increases in the number of rental canoes, which the NPS denied.
16. Numerous canoe rental businesses deliver and retrieve canoes within the Riverways without concession permits or contracts with the NPS. The Free Enterprise Canoe Renters Association of Missouri consists of thirteen of the non-concessioned businesses that operate in this area. These businesses provide the same type of services as the canoe rental concessions subject to the NPS controls and regulations. The number of canoes rented by non-concessioned businesses has increased substantially over the past six years, resulting in increasing traffic on the Current and Jacks Fork Rivers.
17. In August of 1975, Irby Williams a non-concessioned canoe rental operator was issued a citation, charging him with engaging unlawfully in business operations within the Riverways in violation of 36 C.F.R. § 5.3. The regulation prohibits "[e]ngaging in or soliciting any business" in areas managed by the NPS unless the commercial activity is authorized by the agency, its regulations, or a contract with the United States. Williams put the canoe in the Jacks Fork River at Eminence, which is not located within the Riverways, and retrieved the canoe from an access point within the boundaries of the park. The defendant charged a flat rental fee, with no additional charge for the hauling of the canoe. The District Court held that defendant's activities did not constitute "doing business as prohibited by the regulation" inasmuch as Williams did not charge for the retrieval of his canoes. United States v. Irby Williams, No. S75-29 CR (Dec. 22, 1975).
18. In 1976 the Department of Interior promulgated 36 C.F.R. § 7.83(c)(3) which is specifically directed towards controlling commercial canoe rental activity within Riverways. The regulation prohibits "[t]he delivery or retrieval [of canoes] within the boundaries of Ozark National Scenic Riverways ... which has been rented to a member or members of the public at a location not within the Riverways ... whether or not any charge, either separately or in combination with any other charge, is made for these services." In 1976, Williams was issued a citation for violating this newly promulgated regulation. In a second Irby Williams decision, the District Court held that "the United States Government has no authority to prohibit persons from delivering or retrieving canoes from the water on a public road at a point where that public road crosses a river within the park boundary, as long as this is done without charge, even though the action be an adjunct to a business operation." United States v. Irby Williams, No. 76-225 CR (1) (E.D.Mo. Nov. 24, 1976).
19. After the second Irby Williams decision, the NPS did not issue any citations for violations of § 7.83(c)(3) until October of 1981, when citations were issued to the five defendants in the petty offense actions presently before this court. All of the defendants are members of the Free Enterprise Canoe Renters Association of Missouri. In June of 1981 the NPS informed the Association's members and other non-concessioned canoe rental businesses that the *258 NPS would once again issue citations for violations of § 7.83(c)(3). Subsequently, in October, the agency issued the petty offense citations resulting in the criminal action presently before this court. Mr. Sullivan, Park Superintendent of the Riverways testified that although the Irby Williams decision in 1976 made the continued enforcement of the regulation highly impractical, the NPS never adopted a formal policy that § 7.83(c)(3) would not be enforced by Riverways' officials. In fact, Mr. Sullivan testified that he notified the owners of non-concessioned canoe rental businesses that NPS believed it eventually would regain control over unlicensed canoe deliveries and retrievals within the Riverways.
20. An exhibit introduced by the NPS at trial showed that recreational canoe traffic within the Riverways has increased dramatically since the creation of the park. The following figures demonstrate the annual number of canoes that have been found on the Current and Jacks Fork Rivers within the Riverways:

1968 40,000
1973 145,792
1974 138,357
1975 167,954
1976 210,574
1977 251,212
1978 276,156
1979 295,666
1980 286,345
1981 292,468

The Riverways receive its greatest use in the summer season and on the weekends. Therefore, there is a heavy concentration of canoeists within the Riverways on summer weekends resulting in a great deal of activity at the major access points where the majority of canoes are retrieved and delivered. The upper Current River is the area of the Riverways which is the most crowded.
21. In response to the growing number of canoes within the Riverways, the NPS conducted surveys under the supervision of Mr. Kenneth Chilman which indicate that a growing number of canoeists believe that there are too many canoes within the Riverways.
22. In addition to the increased perception of overcrowding by visitors to the Riverways, Mr. Sullivan delineated two additional problems that have resulted from the substantial increase and concentration of canoe floating within the Riverways. First, the increase in canoe traffic has resulted in law enforcement problems for officials of the NPS. There are a growing number of vehicles and buses, towing canoes at access points, which can result in safety hazards at the access points and on the rivers. NPS rangers are responsible for ensuring the safety of park visitors and enforcing federal law enforcement regulations which prohibit disorderly conduct, intoxication, and vandalism. Second, although the rivers presently remain unpolluted, heavy recreational use causes temporary decreases in water quality. Therefore, unless activity on the rivers is controlled, there is a potential for continued, although temporary, adverse effects on water quality.
23. From 1977 to 1978 the NPS compiled data for the purpose of developing a plan for the management of natural and cultural resources in the Riverways. The initial draft was published in October of 1980, after a period of public involvement through open meetings and solicitation. The draft listed three alternatives with respect to growing canoe traffic in the Riverways which included: (1) no action; (2) improving river accesses, institution of a canoe permit system and limiting motorboat traffic; and (3) redistributing canoe traffic through floater education. Following the publication of these alternatives and after further public meetings the NPS published a "Draft General Management Plan" in December of 1981. In the plan, the NPS determined that it would attempt to regulate canoe traffic by imposing regulations on concessioners and by educating visitors.
24. Each of the canoe rental businesses owned by the defendants are located outside the Riverways. Several of the canoes rented at these businesses float on portions of the Current and Jacks Fork Rivers, falling within the boundaries of the Riverways. *259 Delivery and retrieval of the rented canoes are a routine part of these businesses. The businesses charge a flat canoe rental fee and do not make separate charges for hauling canoes. None of these individuals have concession permits or contracts or other written agreements with the NPS permitting them to conduct commercial activities within the boundaries of the Riverways.
25. On October 10, 1981 defendant Peters, at his business, the Arrowhead Canoe Rental, rented a canoe to Rick and Carla Mansfield of Bunker, Missouri. The defendant charged the Mansfields a daily canoe rental rate of $17.00. Peters delivered the canoe and the Mansfields to the Pulltite access which falls within the Riverways boundaries. This delivery was made by way of the Shannon County road right-of-way at Pulltite. The delivery was performed as an integral part and necessary complement to the rental transaction.
26. On October 10, 1981, defendant Bedell, at his business, Leuckel's Landing Canoe Rental, rented a canoe to Steven Haven of Van Buren Missouri, and another canoe to David Norton of Cedar Rapids, Iowa. Tom Bedell delivered the canoes to the Chilton access area on the Current River, which falls within the boundaries of the Riverways. Defendant charged each customer a daily canoe rental rate of $17.00. The defendant delivered the canoes to the river off a road wholly owned and maintained by the United States. The delivery of the canoes was performed as an integral part and necessary complement to the rental transactions.
27. On October 10, 1981, defendant Middleton, at his business, the Scenic Rivers Canoe Rental, rented two canoes to Michael Diehl of St. Louis, Missouri and charged him a daily rental rate of $20.00 for the two canoes. Defendant Middleton delivered the canoes and his customers to the Pulltite access area on the Current River which falls within the boundaries of the Riverways. The defendant delivered the canoes to the river on a Shannon County road right-of-way at Pulltite. The delivery of the canoes was performed as an integral part and necessary complement to the rental transactions.
28. Also on October 10, 1981, defendant Middleton at his business, the Scenic Rivers Canoe Rental, rented two canoes to Howard Hutcherson of Sedalia, Missouri and charged him a daily rental rate of $15.00 for each canoe. The defendant delivered the canoes and his customers to the Alley Spring access area on Jacks Fork River, which is within the boundaries of the Riverways. Defendant Middleton delivered the canoes to the river by way of a paved road and concrete canoe launch built by the NPS. Missouri State Highway 106 crosses the Jacks Fork River at Alley Spring. The State of Missouri has a highway maintenance easement extending 350 Feet upriver from the bridge at Alley Spring; this canoe delivery fell within the area encompassed by this easement. In addition, the delivery of the canoes was performed as an integral part and necessary complement to the rental transactions.
29. On October 3, 1981, defendant Burkhart, at his business, the Pinecrest Canoe Rental, rented three canoes to Harold Eisenbeis and charged him a daily canoe rental rate of $16.00 for each canoe. On that day, the defendant retrieved those canoes at the Cedargrove access area on the Current River, which falls within the Riverways boundaries. The defendant retrieved the canoes off of a road built and maintained by the NPS. The retrieval was performed as an integral part and necessary complement to the rental transactions.
30. On October 3, 1981, defendant Jadwin, at his business, the Ozark Hills Canoe Rental, rented two canoes to Greg Mertz of Kansas City, Missouri at a daily canoe rental rate of $33.00 for the two canoes. Mrs. Clinton, an employee of Ozark Hills Canoe Rental, delivered the canoes and the customers to the Akers access area on the Current River, which falls within the Riverways boundaries. The canoes were delivered via Missouri State Road K which meets the Current River at Akers; a ferry transported the canoes and customers across the river. The delivery was performed *260 as an integral part and necessary complement to the rental transactions.
31. Although the non-concessioned canoe rental businesses do not make a separate and distinct charge for the delivery and retrieval of canoes, the flat rate that they charge necessarily reflects their hauling expenses. The expenses associated with the delivery and retrieval of canoes constitute a large percentage of the expenses of commercial canoe rental businesses that deliver and retrieve canoes within the Riverways.
32. The United States government owns virtually all of the access points within the Riverways, including each of those used by the defendants charged with violations of Regulation 7.83(c)(3). The state roads which traverse the Riverways are well defined and maintained by the State of Missouri; however, the county roads are not paved and therefore are not well defined. As a result, the NPS, for at least ten years, has maintained the non-state roads within the Riverways, in an effort to ensure the safety of park visitors. As a general rule, members of the Free Enterprise Canoe Association stated that their businesses conformed with the principles enunciated in the second Irby Williams decision. However, there was some testimony indicating that non-concessional rental businesses did not always confine their delivery and retrieval of canoes to state and county roads. In fact, due to the largely ill-defined and rural nature of the roads in question, it is not conceivable that the hauling of canoes can be confined to such narrow portions of the access areas. Due to the Irby Williams decision, Regulation 7.83(c)(3) is in effect unenforceable, because it is difficult if not impossible for the rangers to monitor the vehicles of non-concessioned canoe rental businesses to determine whether they are delivering canoes via state and county roads. As a result, NPS has been unable to control or limit the number of canoes within the Riverways.
33. The customers of the non-concessioned canoe rental businesses use the Riverways facilities and resources to the same extent as customers of the concessioned businesses. Visitors to the Riverways make use of improved access points, camp grounds, roads, and comfort stations, and also rely on the law enforcement services of the NPS rangers.
34. On its face, Regulation 7.83(c)(3) is reasonably related to furthering the control and enjoyment of outdoor recreation resources, in addition to preserving and managing the Riverways natural resources, and ensuring public safety within the park. Unless the NPS enforces 36 C.F.R. § 5.3, the NPS will not be able to control the increasing canoe traffic within the Riverways, and the Riverways will be forced to consider implementing less desirable control mechanisms such as the individual permit system.

CONCLUSIONS OF LAW
This court has jurisdiction to review actions of the NPS taken with respect to a regulation pursuant to 28 U.S.C. § 1331. Plaintiff, the Free Enterprise Canoe Association of Missouri claims that its members are entitled to injunctive relief, prohibiting the NPS from issuing citations pursuant to 36 C.F.R. § 7.83(c)(3), because the federal government does not have the authority to prohibit the hauling of canoes on public roads within the Riverways. Furthermore, the Association insists that its reasonable reliance on the laws, as construed by the court in United States v. Irby Williams, No. 76-225 CR(1) (E.D. Mo. Nov. 24, 1976) precludes the conviction of certain of its members for petty offense charges brought as a result of any violations of the regulation. Therefore, the questions of law presented by this case are whether the United States government has the authority to prohibit the delivery or retrieval of canoes on public roads within the park boundaries even if the hauling is offered without a separate charge; whether the regulation on its face is reasonably related to the statutory purposes behind the creation of the Riverways and therefore within the authority of the agency; and finally, whether the regulation validity can be applied to the members of *261 the Free Enterprise Canoe Renters Association of Missouri.
In 1964, Congress created the Riverways by statute. Act of August 27, 1964, P.L., 88th Cong., 78 Stat. 608, 16 U.S.C. §§ 460m-4, 1964, P.L. 88-492, 88th Cong., 78 Stat. 608, 16 U.S.C. §§ 460m-460m-7. (App. 1.) Congress explicitly provided that the creation of the Riverways was
for the purpose of conserving and interpreting scenic and other natural values and objects of historic interest, including preservation of portions of the Current River and Jacks Fork River in Missouri as free-flowing streams, preservation of springs and caves, management of wildlife, and provisions for use and enjoyment of the outdoor recreation resources thereof by the people of the United States ...
Congress further provided the Secretary of the Interior and NPS with the authority to administer the Riverways and manage its natural resources in accordance with the statutes governing management of all national parks. 16 U.S.C. § 460m-5.[4] Accordingly in his management of the Riverways the Secretary may "make and publish such rules and regulations as he may deem necessary or proper for the use and management of parks ... under the jurisdiction of the National Park Service .... He may also grant privileges, leases and permits for the use of land for the accommodation of visitors in the various parks ..." 16 U.S.C. § 3. Therefore, the Secretary's authority to enact regulations to administer the "Riverways" and to grant concessions are both found in Section 3 of Title 16. However, it is the policy of Congress that commercial activity should be limited to that which is necessary and appropriate for public use and enjoyment of the national park area in which the commercial ventures are located. Wilderness Public Rights Fund v. Kleppe, 608 F.2d 1250 (9th Cir. 1979). The statute explicitly provides that "the preservation of park values requires that such public accommodation, facilities, and services ... should be provided only under carefully controlled safeguards against unregulated and indiscriminate use, so that the heavy visitation will not unduly impair" the parks and the purposes for their creation. 16 U.S.C. § 20.
In addition to authorizing the NPS both to enact regulations in relation to the administration of the parks and to award concessions within the limits set by the statute, Congress has also directed the Secretary to "encourage continuity of operation and facilities and services by giving preference in the renewal of contracts or permits ... to the concessioners who have performed their obligations under prior contracts or permits to the satisfaction of the Secretary." 16 U.S.C. § 20d. However, prior to the renewal of a contract or permit the Secretary must evaluate any responses.[5]
The NPS enacted Regulation 7.83(c)(3) in accordance with powers delegated by Congress *262 in 16 U.S.C. § 3, after realizing that it was unable to prohibit non-concessioned canoe rental operators from delivering or retrieving their canoes on a public roadway within the Riverways, if a separate charge was not made for the hauling of the canoe, pursuant to 36 C.F.R. § 5.3. (See Findings of Fact Nos. 17 and 18.) However, in 1976 the District Court held that 36 C.F.R. § 7.83(c)(3) was invalid to the extent that it prohibited "persons from delivering or retrieving canoes from the water on a public road at a point where the public road crosses a river within the park boundary, as long as this is done without charge, even though the action may be an adjunct to a business operation." United States v. Irby Williams, No. 76-225 CR(1) (E.D. Mo. Nov. 24, 1976). The court reasoned that the United States government did not have the authority to prevent non-concessioned canoe and rental businesses from engaging in these activities on public roads.
Subsequent to the second Irby Williams decision, although the case was never appealed,[6] the Eighth Circuit has had the opportunity to rule on the question of whether the NPS has the authority to regulate lands or water adjoining national parks, that have not been ceded to the federal government by the state. State of Minnesota by Alexander v. Block, 660 F.2d 1240 (8th Cir. 1981), cert. denied, ___ U.S. ___, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982); United States v. Richard, 636 F.2d 236 (8th Cir. 1980); United States v. Brown, 552 F.2d 817 (8th Cir. 1977), cert. denied 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). In each instance, the court concluded that it was within Congress' power under the Property Clause[7] to enact federal regulations affecting non-federal lands if the regulation is necessary for the protection of human life, wildlife, government land or objectives. United States v. Richard, 636 F.2d at 240. The court recognized that the Supreme Court has upheld an expansive reading of the power of Congress to legislate under the Property Clause. Citing Kleppe v. New Mexico, 426 U.S. 529, 536-40, 96 S.Ct. 2285, 2290-92, 49 L.Ed. 34 (1974) the Eighth Circuit reasoned that "the crucial question is whether federal regulations can be deemed `needful prescriptions' respecting the public lands. This determination is primarily entrusted to the judgment of Congress, and courts exercising judicial review have supported an expansive reading of the Property Clause." United States v. Brown, 552 F.2d at p. 822. In light of the standards enunciated by the Eighth Circuit, it must be concluded that the NPS has the authority under the Property Clause to enact a regulation prohibiting the delivery or retrieval of canoes within the boundaries of the Riverways by non-concessioned canoe rental businesses whether or not an extra fee is charged or delivery takes place on a public road. 36 C.F.R. § 7.83(c)(3).
The judicial review of a regulation is confined to the question whether the NPS has acted within its authority and whether the action of the agency is arbitrary or capricious. Arkansas Pharmacists Ass'n. v. Harris, 627 F.2d 867, 870 (8th Cir. 1980); Wilderness Public Rights Fund v. Kleppe, 608 F.2d 1250, 1253 (9th Cir. 1979). Therefore, Regulation 7.83(c)(3) is valid if it is reasonably related to the statutory purposes behind the enactment of the Riverways. In addition, there is a judicial presumption favoring *263 the validity of administrative action. Wilderness Public Rights Fund v. Kleppe, 608 F.2d at 1254 (citing Duesing v. Udall, 350 F.2d 748 (D.C. Cir. 1965) cert. denied 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966)). When Congress enacted the statute establishing Riverways in 1964, it expressly stated that its creation was "for the purpose of conserving and interpreting unique scenic and other natural values." 16 U.S.C. § 460m. This purpose was to be accomplished by preserving the rivers as free-flowing streams, preserving springs and caves, managing wildlife and providing outdoor recreation to the public. 16 U.S.C. § 460m. Therefore the provision of recreation to the people of the United States is one of the many goals behind the creation of the Riverways, which must be balanced with competing goals embodied in the statute. Furthermore, whenever, the agency permits commercial activities in national parks, it must guard against "unregulated and indiscriminate use." 16 U.S.C. § 20.
In view of the principles enunciated by Congress in its creation of the Riverways, it must be concluded that the enactment of § 7.83(c)(3) is reasonably related to the statutory purposes of the Riverways. Regulation of the numbers of canoes on the Jacks Fork and Current Rivers, achieved through the enforcement of this regulation, provides for the use and enjoyment of the Riverways and at the same time preserves natural resources and guards against "heavy visitation." 16 U.S.C. §§ 20, 460m. Furthermore, by precluding non-concessioned commercial activity, the regulation will allow the NPS to control the quality of services provided to the public in the Riverways. The record reflects that growing numbers of park visitors perceive the river as overcrowded. (See Findings of Fact Nos. 20 and 21). In addition studies have indicated that there have been at least temporary adverse effects upon river quality within the Riverways during peak canoe use. (See Findings of Fact No. 22). All these factors indicate that the enactment of the regulation is not arbitrary or capricious. Inasmuch as the NPS has the power under the Property Clause to control the activities of non-concessioned canoe businesses on public roads, and the regulation is a valid exercise of the agency's discretion, there is no basis for granting the injunctive relief sought by the Association.
The final argument the Free Enterprise Canoe Renters Association of Missouri offers in support of its request for injunctive relief is that the agency's enforcement of the regulation against its members is arbitrary and capricious. The Association contends that its members relied upon the Irby Williams decisions and therefore the NPS should be enjoined from prohibiting non-concessioned canoe rental businesses from retrieving and delivering canoes on public roads within the Riverways if no separate hauling charge is requested. The defendants in the criminal action also argue that they should not be held criminally liable for their good faith reliance on the principle articulated in Irby Williams.[8]
It is clear from the record that the Association and the defendants in the criminal action were aware of NPS's displeasure with the Irby Williams decision. (See Findings of Fact No. 19). In addition there have been several recent Eighth Circuit decisions which have upheld regulations similar to § 7.83(c)(3). State of Minnesota by Alexander v. Block, supra; United States v. Richard, supra; United States v. Brown, supra. The Association and the criminal defendants cannot rely on one district court's decision for their complete knowledge of the law in this area. Finally, the NPS notified the Association and its members that the agency would once again issue citations for violations of § 7.83(c)(3), several months before arresting the defendants. *264 The decision of the government to institute criminal proceedings rather than immediately institute a civil action for injunctive relief was merely a choice of remedy which does not constitute arbitrary conduct or an abuse of discretion. Downstate Stone Company v. United States of America, 651 F.2d 1234 (7th Cir. 1981).
Accordingly, defendants are liable as charged in the informations in the criminal action, and the Free Enterprise Canoe Renters Association of Missouri's request for injunctive relief in the civil action will be denied.
NOTES
[1] The relevant portions of § 7.83(c) provide: The activities listed herein constitute commercial activities which are prohibited within the boundaries of Ozark National Scenic Riverways, except in accordance with the provisions of a permit, contract or other written agreement with the United States.... The delivery or retrieval within the boundaries of Ozark National Scenic Riverways of watercraft or associated boating equipment which has been rented to a member or members of the public at a location not within the Riverways, when such delivery or retrieval is performed by a principal, employee or agent of the commercial enterprise offering the equipment for rental and when these services are performed as an integral part, necessary component, or routine adjunct of or to the rental transaction, whether or not any charge, either separately or in combination with any other charge, is made for these services.
[2] There are two Irby Williams decisions that dealt with issues relevant to the disposition of the case presently before this court. In the first decision the court held that a defendant who failed to charge for the delivery of canoes and who retrieved his canoes from a public roadway within the part was not "doing business" within the meaning of the federal regulation. United States v. Irby Williams, No. S75-29 CR (E.D. Mo. Dec. 22, 1975). Therefore, the court found that the defendant had not violated 36 C.F.R. § 5.3 which prohibits "[e]ngaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract or other written agreement with the United States ..." In response to this decision, the Secretary promulgated 36 C.F.R. § 7.83(c) which explicitly applies to the Ozark National Scenic Riverways. The second Irby Williams decision deals both with the question of the validity of § 7.83(c) and the question of the government's authority to promulgate the regulation. United States v. Irby Williams, No. 76-225 CR(1) (E.D. Mo. Nov. 24, 1976). In its interpretation of the regulation, the court recognized that the purpose of § 7.83(c) was to prohibit the delivery or retrieval of canoes and boating equipment within the boundaries of the park without a permit, even though there was no charge for hauling. However, the court believed that complete enforcement of the regulation was impossible because "the United States Government has no authority to prohibit persons from delivering or retrieving canoes from the water on a public road at a point where the public road crosses a river within the park boundary, as long as this is done without charge, even though the action may be an adjunct to a business operator." Id. at p. 2. Therefore, the holding in the second Irby Williams decision was premised upon the belief that the government did not have the "authority" to enforce the statute as written, rather than upon an interpretation of the statute. The Free Enterprise Canoe Renters Association of Missouri argues that its members are in compliance with the law because they have followed the requirements delineated in the Irby Williams decision, which they assert represents the correct interpretation of the law. In the alternative, they argue that defendants committed themselves to following the Irby Williams decisions and therefore should be estopped from reneging on their commitment.
[3] The civil action brought by the Free Enterprise Canoe Renters Association of Missouri was consolidated with the criminal action brought against certain members of the Association, who were issued petty offense citations alleging violation of Regulation 7.83(c)(3).
[4] 16 U.S.C. § 1 creates the National Park Service and directs it to "promote and regulate the use of Federal areas known as national parks, monuments and reservations." Congress further provided that the purpose of the NPS is "to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."
[5] The Free Enterprise Canoe Renters Association of Missouri argues that the present permits awarded to the concessioners in the park are invalid because NPS did not notify the public in the late 1960s when special use permits were first awarded, or in 1975 when the permits were converted into concession permits so as to bring them expressly within the terms of the Concession Policy Act, 16 U.S.C. §§ 20-20g. However, it was conceded at trial that public notice was provided by NPS upon renewal of the permits. (See Findings of Fact No. 12). 16 U.S.C. § 3 expressly authorizes the agency to issue permits without any public advertising or competitive bids. United States v. Gray Line Water Tours of Charleston, 311 F.2d 779, 782 (4th Cir. 1962). It was not until 1979 that the Department of Interior promulgated regulations requiring that public notice be given upon the issuance of an initial contract or permit. 36 C.F.R. part. 51; 44 Fed. Reg. 62895. This regulation does not have any effect on these permits because they were issued prior to the promulgation of the new regulation. Therefore the permits issued to the concessioners presently operating in the Riverways are valid.
[6] In United States v. Richard, 636 F.2d 236 (8th Cir. 1980), the Eighth Circuit upheld a federal regulation prohibiting non-concessioned canoe rental businesses from delivering and retrieving canoes within the Forest, without a permit. After distinguishing the second Irby Williams decision the court concluded that the federal regulation was valid in its control of non-federal lands because it was necessary for protection of forest land and statutory objectives. In response to the government's argument that the Irby Williams decision was no longer a valuable precedent, the court responded that the case was never appealed. However, the court directed other courts in the future to examine later case law when ruling upon similar issues. Id. at 240-41.
[7] The Property Clause provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ... U.S. Const. Art. IV § 3 cl.2.
[8] The defendants assert two additional defenses to liability under regulation 7.83(c)(3). First, they contend that they delivered or retrieved canoes within the state or county road right-of-ways; and second, they argue that they did not require a separate charge for haul. The first defense is invalid inasmuch as the NPS is fully authorized to control activities on public roads pursuant to the Property Clause. The second argument is without merit because the regulation makes the charging of an additional fee for hauling irrelevant.