711 F.2d 852
 FREE ENTERPRISE CANOE RENTERS ASSOCIATION OF MISSOURI, Appellant,
v.
James WATT, Secretary of Interior; Ray Arnett, Assistant
Secretary of Interior; Jimmy Dunning, Regional Director of
the National Park Service; and Arthur Sullivan, Park
Superintendent of the Ozark National Scenic Riverways, Appellees.
UNITED STATES of America, Appellee,
v.
Jack PETERS, Tom Bedell, Ernie Middleton, Willard Burkhart,
and Clinton Jadwin, Appellants.
 Nos. 82-2246, 82-2304.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 16, 1983.
Decided July 11, 1983.
Motion for Clarification Denied Aug. 15, 1983.
 
 Kohn, Shands, Elbert, Gianoulakis & Giljum, Alan C. Kohn, Terry Lueckenhoff, St. Louis, Mo., for appellants.
 Thomas E. Dittmeier, U.S. Atty., James E. Crowe, Jr., Asst. U.S. Atty., St. Louis, Mo., for appellee.
 Before HEANEY, McMILLIAN and ARNOLD, Circuit Judges.
 ARNOLD, Circuit Judge.
 
 
 1
 These appeals concern the validity of the Interior Department's regulation prohibiting the delivery or retrieval of rented canoes within the boundaries of the Ozark National Scenic Riverways (ONSR) without a permit, 36 C.F.R. § 7.83(c)(3) (1982). The appellant, Free Enterprise Canoe Renters Association of Missouri (the Association), brought a civil action seeking an injunction against enforcement of the regulation against its members, and at about the same time the National Park Service issued criminal citations under the regulation against five Association members. The District Court,[1] after trying both the civil and criminal cases jointly, refused to enjoin enforcement of the regulation and found the Association members guilty of violating it. We affirm the judgments of the District Court.
 
 I.
 
 2
 The ONSR is a 140-mile-long, narrow strip of land on the banks of the Current and Jacks Fork Rivers in southern Missouri.[2] Congress authorized creation of the ONSR in 1964, "[f]or the purpose of conserving and interpreting unique scenic and other natural values and objects of historic interest, including preservation of portions of the Current River and the Jacks Fork River in Missouri as free-flowing streams ... and provisions for use and enjoyment of the outdoor recreation resources thereof ...." 16 U.S.C. § 460m (1976). The Department of the Interior and the Park Service administer and supervise the ONSR under authority granted by 16 U.S.C. § 460m-5 (1976). Accordingly, under 16 U.S.C. § 3 (1976), the Secretary of the Interior may make rules and regulations for the use and management of the ONSR and issue permits for the accommodation of visitors within the ONSR.
 
 
 3
 Within the ONSR's authorized outer boundary, approximately 51,500 acres are federally owned, 14,000 acres are state-owned, and 6,400 acres are privately owned. Roads within the ONSR are variously owned by the state, county, and federal governments. Regardless of ownership, the Park Service maintains virtually all unpaved roads leading to river access points. In 1971, Missouri ceded concurrent jurisdiction to the federal government over the entire area comprising the ONSR. Mo.Ann.Stat. § 12.025 (Vernon Supp.1983).
 
 
 4
 In the late 1960's, sixteen canoe-rental operations served the ONSR area. In addition to providing canoes to members of the public who desire to float down the rivers in the ONSR, these businesses also deliver and retrieve the canoes to and from the rivers' access points. The Park Service issued special use permits to each of these sixteen businesses for operation within the ONSR in 1970, and added a seventeenth permittee in 1972. In 1973, the Park Service decided that special use permits were not appropriate for canoe-rental operations, and accordingly converted the seventeen permits to concession permits. Under the permits, the concessioners are required to pay a franchise fee, acquire liability insurance, and conform to safety and performance standards. The Park Service sets maximum rental rates and must approve any transfer of the concession permits. Both the special use permits and the concession permits were initially issued without public notice, but as they have periodically come up for renewal, the Service has given some form of public notice.[3]
 
 
 5
 In 1970, the Park Service began research to study the possible adverse effects of increased recreational usage on the land, water quality, aquatic ecosystem, and visitor safety within the ONSR. In conjunction with this research, the Service placed a moratorium on the issuance of new canoe-rental permits and capped the number of canoes allowed to existing concessioners[4] pending completion of the study and evaluation of its results.
 
 
 6
 The study, completed in 1977, disclosed a dramatic increase in the number of canoeists on the river since creation of the ONSR.[5] Although recreational use has not yet significantly harmed the environment, researchers found temporary decreases in water quality related to heavy usage and increased law-enforcement problems and safety hazards due to congestion, especially at access points. In studying canoeists' perceptions of crowding within the ONSR, researchers discovered that increasing numbers of canoeists encountered more canoeists than they desired and perceived problems as a result of overcrowding.
 
 
 7
 One of the factors contributing to the growing amount of canoe traffic on the ONSR has been the increase in the number of canoe-rental businesses operating near the ONSR without concession permits. The appellant Association consists of fourteen such non-concessioned businesses, run by thirteen individuals. The Park Service has made a number of efforts to control non-concessioned canoe renters. In 1975, the Service charged Irby Williams, the founder of the Association, with violating 36 C.F.R. § 5.3 (1982).[6] The Park Service alleged that in retrieving rented canoes from a sand bar next to a public road running through the ONSR, Williams had engaged in business operations within the ONSR without a permit. The District Court found that Williams's place of business was outside the ONSR boundaries, that he made no charge for retrieving the canoes, and that retrieval took place on a public road. Accordingly, the District Court held that Williams was not guilty of doing business within the ONSR in violation of the regulation. United States v. Williams, No. S75-29 Cr (E.D.Mo. Dec. 22, 1975) (Williams I ).
 
 
 8
 The Park Service responded to Williams I by promulgating a more specific regulation. Under 36 C.F.R. § 7.83(c)(3), a permit is now required for "[t]he delivery or retrieval within the boundaries of Ozark National Scenic Riverways of watercraft ... which has been rented to a member or members of the public at a location not within the Riverways ...." The regulation also provides that a permit is required whether or not a separate fee is charged for canoe haulage. The government issued another criminal citation to Irby Williams under the new regulation in 1976, but the District Court again acquitted him, holding
 
 
 9
 that the United States Government has no authority to prohibit persons from delivering or retrieving canoes from the water on a public road at a point where that public road crosses a river within the park boundary, as long as this is done without charge, even though the action may be an adjunct to a business operation.
 
 
 10
 United States v. Williams, No. 76-225, Cr (1), slip op. at 2 (E.D.Mo. Nov. 24, 1976) (Williams II ).
 
 
 11
 Following Williams II, the Park Service stopped issuing citations under § 7.83(c)(3) for a time, although it never adopted a formal policy of non-enforcement of the regulation. During this non-enforcement period, non-concessioned canoe-rental businesses proliferated. In 1977 and again in 1979, the Service granted temporary 25-canoe increases to each of the seventeen concessioners to help them meet competition from businesses without permits. As a result, concessioners now have 1,719 canoes available for rental, while Association members have an estimated 800 canoes available.
 
 
 12
 In the Draft General Management Plan for the ONSR published in 1981, the Park Service voiced its intention to regain control of the volume of canoe traffic through regulating the number of canoe-rental operations. In June 1981, the Service announced that it no longer considered Williams II to be good law, and therefore planned to begin enforcing § 7.83(c)(3) again. The government subsequently issued citations under the regulation to five members of the Association in October of 1981. Also in October of 1981, the Association filed suit against officials of the Department of the Interior to enjoin enforcement of the regulation.
 
 
 13
 The criminal and civil cases were tried together in a bench trial. On October 8, 1982, the District Court entered judgment in favor of the federal defendants in the civil case, holding that § 7.83(c)(3) was valid and enforceable. In the same order, the District Court found all of the criminal defendants guilty of violating § 7.83(c)(3) and assessed a $1.00 fine against each. These appeals followed.
 
 II.
 
 14
 It is undisputed that the United States acted within its constitutional authority in attempting to regulate the business activities of the members of the Association as they affect the ONSR, even though the members themselves may never enter federally owned property, but strictly keep to state or county roads and rights-of-way within the ONSR. In Minnesota v. Block, 660 F.2d 1240 (8th Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982), this Court construed the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2, and concluded that "[u]nder this authority to protect public land, Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands." Id. at 1249 (footnote omitted). See also United States v. Richard, 636 F.2d 236, 240 (8th Cir.1980) (per curiam) ("federal regulation may exceed federal boundaries when necessary"), cert. denied, 450 U.S. 1033, 101 S.Ct. 1745, 68 L.Ed.2d 228 (1981); United States v. Lindsey, 595 F.2d 5, 6 (9th Cir.1979) (per curiam); United States v. Brown, 552 F.2d 817, 822 (8th Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977).
 
 
 15
 Furthermore, we agree with the District Court that the action of the Park Service in promulgating § 7.83(c)(3) was not arbitrary and capricious. In creating the ONSR, Congress charged the Service not only with providing for outdoor recreation but also with preserving the rivers, springs, caves, wildlife, and other resources in the area. Under 16 U.S.C. § 20 (1976), in allowing commercial activities the Service must guard against "unregulated and indiscriminate use" of the areas under its administration. Section 7.83(c)(3) is a proper attempt to protect the ONSR against over-commercialization by controlling canoe traffic.
 
 
 16
 While admitting that its members are subject to the Park Service's regulatory power, the Association argues that § 7.83(c)(3) as drafted does not apply to them, and that the government should be estopped to enforce the regulation because of its acquiescence in the two Williams decisions described above.
 
 A. Applicability of regulation
 
 17
 Under § 7.83(c)(3), the Park Service has prohibited "[t]he delivery or retrieval within the boundaries of Ozark National Scenic Riverways" of rented watercraft without a permit. This regulation was promulgated in response to the District Court's decision in Williams I that the more general regulation prohibiting business activity in national parks without a permit, 36 C.F.R. § 5.3, does not apply to operators such as Williams, who claim to make no separate charge for hauling canoes and stay on public roads within the park. The Association argues that Williams II similarly held § 7.83(c)(3) inapplicable to Williams's operations on the ground that public roads owned by the state or a county are outside the boundaries of the ONSR. We disagree. Williams II rested on the District Court's conclusion that the federal government had no authority to prohibit canoe delivery and retrieval on nonfederal public roads. That conclusion was questioned in United States v. Richard, 636 F.2d at 241, and we hereby specifically disapprove it. We do not read the District Court's opinion in Williams II as holding that the language of § 7.83(c)(3) does not cover activities on nonfederal land within the ONSR.
 
 
 18
 We conclude that § 7.83 applies to the business activities of Association members, even assuming that they have conformed to the letter of the Williams decisions.[7] The phrase "within the boundaries" in the regulation means everything within the outer boundaries of the ONSR, including state and county roads. While it is true that ambiguities in criminal statutes should be resolved in favor of the defendant, e.g., Adamo Wrecking Co. v. United States, 434 U.S. 275, 285, 98 S.Ct. 566, 572-73, 54 L.Ed.2d 538 (1978), the regulation in question is unambiguous. The boundaries of the ONSR incorporate federal, state, and private land, and the regulation makes no distinctions on the basis of ownership. Given the recognized federal power to regulate nonfederal land, there is no reason to doubt the Park Service's interpretation of its own regulation, which is that it covers all the ONSR area, not just the portions that are federally owned. We conclude that in § 7.83(c)(3), the Service effectuated its intent to regulate all canoe-rental businesses serving the ONSR.B. Estoppel
 
 
 19
 According to the Association, the Park Service should be estopped to enforce § 7.83(c)(3) against Association members because they acted in reliance on Williams II. The Association members claim that the government may not recommence enforcing § 7.83(c)(3), because its non-enforcement policy following Williams II induced them to expend significant amounts of time and money on their canoe-rental businesses.
 
 
 20
 Estoppel is not a defense in this case for a number of reasons. First, the Association members' reliance was not justified by the Park Service's conduct. The government could not gain immediate review of Williams II, because an appeal from a criminal acquittal would have raised double-jeopardy problems. Nevertheless, its agents consistently informed canoe renters who followed in Williams's footsteps that they proceeded at their own risk, because the Park Service fully intended to regain control of canoe traffic on the ONSR. When the Service decided to begin enforcing § 7.83(c)(3) again after this Court's decision indicating disapproval of Williams II, the Association members received fair notice in June of 1981. Thereafter, no citations were issued until October of 1981.
 
 
 21
 In the absence of affirmative misconduct, the government may not normally be estopped by misrepresentations or misinformation given by its agents. See, e.g., Abbott v. Harris, 610 F.2d 563, 564-65 (8th Cir.1979) (per curiam); Leimbach v. Califano, 596 F.2d 300, 305 (8th Cir.1979). Here, the Park Service's employees and officials have engaged in no misconduct and made no misrepresentations. The decision to acquiesce for a time in Williams II, without affirmatively accepting it as correct, is not the same thing as a promise that the regulation would never again be enforced.
 
 
 22
 Similarly, the mistake-of-law defense, which is the criminal analogue of estoppel, does not apply in this case. In order to establish this defense, the Association members would have to show reasonable reliance on an official statement of the law later determined to be invalid. See Model Penal Code § 2.04(3)(b); United States v. Moore, 586 F.2d 1029, 1033 (4th Cir.1978) (dictum). Here the Association members were notified well before the commencement of criminal proceedings that the Park Service considered Williams II to be invalid. Accordingly, they subsequently relied on Williams II at their own risk.
 
 C. Validity of permits
 
 23
 In addition to challenging the validity of § 7.83(c)(3) as applied in this case, the Association argues on appeal that the concessioners' permits are invalid. The Association complains that the Park Service improperly failed to give public notice when the permits were initially issued and gave inadequate notice when the permits were renewed. In addition, the Association alleges that the Service acted arbitrarily and capriciously in denying permits to Association members.
 
 
 24
 The District Court did not address the issue of the validity of the concessioners' permits. We also decline to reach this issue, because the concessioners are not parties to this action. It would be improper to adjudicate the validity of their permits without giving them notice and an opportunity to be heard. See Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc., 564 F.2d 816, 819 (8th Cir.1977).
 
 
 25
 With respect to whether the Service should have awarded permits to Association members, we note that few, if any, Association members have applied for permits, both because of the Service's moratorium on issuing new permits and because Williams II was thought by some to make permits unnecessary for a time. At oral argument, we questioned counsel for the government closely concerning the reasons why the Service granted increased numbers of canoes to existing concessioners in 1977 and 1979 instead of opening the field to new concessioners. Apparently because non-concessioned operations were growing without restraint at that time, when the Service decided to permit additional canoe traffic on the ONSR, it allocated the increase to concessioners, because they were the only ones subject to government limitations. This decision was not arbitrary or capricious.
 
 
 26
 But from now on, the situation will be different. All canoe renters serving the ONSR must have permits. Although it may seem unfair that the Association members must cease operating within the ONSR until they obtain permits, they began operating without permits at their own risk. The Service may, of course, set the total number of permits and canoes at whatever level it reasonably calculates will best serve the needs of the public and its responsibility to protect the ONSR. Nonetheless, we expect no discrimination in the future when permits come up for renewal. At oral argument, counsel for the government represented that when the current permits expire, nonconcessioned operators will be able to compete with concessioners for permit renewals on an equal footing and on the basis of objective and published criteria. We accept this representation.[8]
 
 III.
 
 27
 In conclusion, we hold that the Park Service validly promulgated § 7.83(c)(3) and properly enforced it against the appellant Association members. Under the regulation, all canoe renters who deliver or retrieve canoes within the outer limits of the ONSR must have a permit. The judgments of the District Court are
 
 
 28
 Affirmed.
 
 ORDER
 
 29
 The Court has before it the motion of appellee for amendment or clarification of its opinion, together with the objection thereto of appellants.
 
 
 30
 We have carefully reviewed the tape of the oral argument, with particular reference to the representation made by counsel for appellee with respect to the opportunity of non-concessioned operators to be considered for permits in the future. The phrase "on an equal footing," used on page 858 of our opinion, did not occur during the oral argument. The phrase used in the colloquy between counsel and the Court was, instead, that the non-concessioned operators would be given "a fair opportunity to compete." In our view, a fair opportunity to compete requires that the non-concessioned operators, in the particular circumstances of this case, be considered in the future on an equal footing with existing concessioners, when those concessioners' permits come up for renewal.
 
 
 31
 The motion for amendment or clarification of the opinion is therefore denied.
 
 
 32
 It is so ordered.
 
 
 
 [1]
 The Hon. John F. Nangle, United States District Judge for the Eastern District of Missouri. Since rendering this decision, Judge Nangle has become Chief Judge of the Eastern District of Missouri. The District Court's opinion is reported as Free Enterprise Canoe Renters Association of Missouri v. Watt, 549 F.Supp. 252 (E.D.Mo.1982)
 
 
 [2]
 The continuity of the ONSR is interrupted by the exclusion of all land within two miles of the towns of Eminence and Van Buren, which are located next to the rivers
 
 
 [3]
 Regulations promulgated in 1979, 36 C.F.R. Part 51 (1982), establish notice requirements and competitive bidding procedures to be followed for issuance and renewal of concession permits
 
 
 [4]
 In 1972, a total of 839 canoes were available for rental by the 17 concessioners
 
 
 [5]
 The estimated numbers of canoeists on the rivers through 1981 follow:
 Year Number
---- -------
1968 40,000
1973 145,792
1974 138,357
1975 167,954
1976 210,574
1977 251,212
1978 276,156
1979 295,666
1980 286,345
1981 292,468
 
 
 [6]
 The regulation provides: "Engaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited."
 
 
 [7]
 We note that the district court found that the Association members' flat fee for canoe rental reflects their hauling expenses and that the ill-defined nature of state and county roads within the ONSR makes it inconceivable that delivery and retrieval can be confined to public areas. Also, two of the five renters who received criminal citations were actually found to have delivered or retrieved canoes on Park Service roads. Thus some, if not all, of the Association members clearly did not follow the Williams guidelines
 
 
 [8]
 We recognize that 16 U.S.C. § 20d (1976) authorizes a renewal preference for existing concessioners. However, the statute does not require the Secretary to honor the preference. It provides that "the Secretary, at any time in his discretion, may extend or renew a contract or permit ...." (emphasis added.)