574 F.Supp. 505 (1983)
George STORY, Story Farms, Inc., a corporation; Hunter Raffety; W.C. Bryant; Bryant Farms, Inc., a corporation; Glen E. Ault, Jr.; Wendell Choate; Choate Farms, Inc., a corporation; Lloyd Hall; Jim Bogle; Mount Level Farms, Inc., a corporation; Consolidated Drainage District No. 1 of Mississippi County, Missouri and Levee District No. 3 of Mississippi County, Missouri, Plaintiffs,
v.
John O. MARSH, Jr.; Secretary of the Army; General Joseph K. Bratton, Chief of Engineers Corps of Engineers, U.S. Army; General William E. Read, Division Engineer, Lower Mississippi Valley Division, Corps of Engineers, U.S. Army and President, Mississippi River Commission, and Colonel John F. Hatch, Jr., District Engineer, Memphis District, Corps of Engineers, U.S. Army, Defendants.
UNITED STATES of America, Plaintiff,
v.
11.9 ACRES OF LAND, et al., 62 Acres of Land, et al., 62 Acres of Land, et al., and 1,426.5 Acres of Land, et al., Defendants.
Nos. S 83-65 C, S 83-49 C, S 83-51 C, S 83-54 C, S 83-52 C and S 83-55 C.
United States District Court, E.D. Missouri, Southeastern Division.
October 31, 1983.
*506 *507 James E. Reeves, Ward & Reeves, Caruthersville, Mo., Stephen E. Strom, Finch, Bradshaw, Strom & Steele, Cape Girardeau, Mo., for plaintiffs in No. S 83-65 C and defendants in Nos. S 83-49 C, S 83-51 C, S 83-54 C, S 83-52 C and S 83-55 C.
Rebecca A. Donnellan, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Edwin B. Brzezinski, Asst. U.S. Atty., St. Louis, Mo., for defendants in No. S 83-65 C and plaintiffs in Nos. S 83-49 C, S 83-51 C, S 83-54 C, S 83-52 C and S 83-55 C.
Bruce A. Ring, Missouri Highway Commission, Jefferson City, Mo., for defendants in Nos. S 83-49 C, S 83-51 C, S 83-54 C, S 83-52 C and S 83-55 C.

*508 MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits following a five-day hearing. This cause involves a consolidation of five cases. One case, Story v. Marsh, Case No. S 83-65 C, concerns an action filed by a number of landowners for a permanent injunction to prevent the Army Corps of Engineers from flooding the Birds Point-New Madrid Floodway. The remaining four cases, Case Nos. S 83-49 C, S 83-51 C, S 83-52 C, S 83-54 C and S 83-55 C, are actions by the United States of America for immediate possession of four tracts of land within the floodway.
After considering the pleadings, testimony of the witnesses and the various memoranda submitted on behalf of the respective parties, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact equally applicable as a conclusion of law is adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such. Furthermore, the Court confirms and adopts its findings of fact and conclusions of law entered May 10, 1983, at the conclusion of the hearing on the preliminary injunction in this cause.

Findings of Fact
1. The Birds Point-New Madrid Floodway (hereinafter the Floodway) is an area of approximately two hundred five (205) square miles located on the Missouri side of the Mississippi River. The Floodway was developed as part of the Flood Control Act of 1928, adopting the report of the Chief of Engineers, Edwin Jadwin, as delineated in House Document No. 90. At the time of its establishment, the Floodway was primarily undeveloped and unimproved land. The area now contains about one hundred thirty thousand (130,000) acres of highly developed and improved land and supports a population of approximately thirteen hundred (1300) persons in approximately three hundred thirty (330) residences. Additionally, there exists in the Floodway a number of public ditches and highways as well as historical and archaeological sites.
2. As originally designed, the Floodway provided for a frontline levee to protect the area within the Floodway until the Mississippi River reached a stage of fifty five (55) feet on the Cairo gauge. At this point, the river would naturally overtop the frontline levee, filling the Floodway. The original plan was substantially modified by the Flood Control Act of 1965. This Act provided in pertinent part:
The project for flood control and improvement of the lower Mississippi River adopted by the Act of May 15, 1925 (45 Stat. 534), as amended and modified, is hereby further modified and expanded to include the projects and plans substantially as recommended by the Chief of Engineers in House Documents numbered 308 and 319, 88th Congress, at an estimated cost of One Hundred Eighty One Million One Hundred Nine Thousand Dollars ($181,109,000) except that (1) any modified easements required in the improvement of the Birds Point-New Madrid, Missouri floodway shall be acquired as provided by § 4 of the Act of May 15, 1928...."
3. House Document 308 is a six-volume study. On page 57 of Volume I, under the heading "Possible Methods of Improvement", the document describes a plan in which the Army Corps of Engineers (hereinafter the Corps) would build up the existing system of levees. The document further states:
The improvement if authorized should be subject to the following conditions: (a) that the floodway normally will not be placed in operation until flood heights in excess of sixty feet on the Cairo gauge are predicted; (b) that the federal government reserves the right to insure proper functioning of the floodway by creation of artificial crevasses in the fuseplug levee or elsewhere when stages are at or above fifty eight feet on the Cairo gauge; (c) that local interests provide without costs to the United States *509 all rights-of-way required for construction of the modified project; acquire and furnish free of cost to the United States flowage easements to permit operation of the floodway at stages equal to or above fifty eight feet on the Cairo gauge; maintain the levees after completion, including the flood fuseplug sections under the modified plan; and save and hold harmless the United States from any and all damages due to the construction and operation of the modified plan; (d) that repair of crevasses after operation of the floodway will not be the responsibility of local interest.
4. As finally brought to fruition, the 1966 plan dealing with the Floodway resulted in the following modifications: The floodwall at Cairo, Illinois, was raised to 65.3 feet on the Cairo gauge; the frontline levee of the floodway was raised to 62.5 feet; the fuseplug section was raised to 60.5 feet; the western setback levee (i.e., the levee on the western side of the Floodway which acts to contain the floodwaters in the Floodway), is at 65.5 feet.
5. As described, supra, House Document 308 permits artificial crevassing of the levee when necessary "to insure proper functioning of the Floodway." On page 148, the Document states:
The proposed improvement would assure protection of the lands from floods up to a stage of 60 feet on the Cairo gauge, but would permit breaching of the levees at a stage of 58 feet if a flood higher than 60 feet were forecast. The probable frequency of flooding with reservoirs existing and reasonably assured of construction would be reduced from about once in seventeen years to once in eighty years. It is deemed necessary to secure modified easements in the Birds Point-New Madrid area that will specifically permit breaching of the levee at any point. Local interests have indicated that they are willing to modify the easements to meet these requirements of operation.
6. The government has obtained modified easements over a portion of the Floodway. However, as graphically illustrated by plaintiffs' Exhibit "1", a chart prepared by the Corps, large portions of the Floodway are unencumbered by the modified easements. Among the tracts of land over which modified easements have not been obtained are those along the frontline levee. These tracts constitute the subject matter of the pending condemnation actions.
7. Pursuant to authority granted by the 1965 Act, the Corps of Engineers considered four plans for the operation of the Floodway. These plans ranged from the unrestricted right to crevasse the frontline levee at any place, to a plan confining the crevassing to the upper fuseplug section. The district engineer recommended, and the Corps adopted, the plan confining the crevassing to the upper fuseplug section. In recommending this plan the district engineer stated:
"Recommendation. Plan A (Inflow crevasses confined to the upper fuseplug section) is the minimum required to meet present design criteria. It can be accomplished with a minimum cost. It is operational, practicable and least objectionable to local interests. It is recommended that Plan A be approved as: a. The plan of operation of the Birds Point-New Madrid floodway. b. The basis for acquisition of land and modified flowage easements, including the Matthews, et al. land. c. The basis for proceeding with construction planning.
The district engineer also stated (paragraph 10J, Plaintiffs' Exhibit "14"):
Local interests have expressed opposition to providing the right to crevasse the levee outside the fuseplug section. It is felt that they would generally go along with confining the crevasses to the fuseplug section and obtaining the modified easements would be considerably less difficult.
The President of the Mississippi River Commission, General Davis, in approving the recommendation of the Commander of the Memphis District, stated in paragraphs *510 6, 7 and 8 of his letter dated August 19, 1966, to the Chief Engineer as follows:
6. Local interests have expressed opposition to providing the right to crevasse the levee outside the fuseplug section. I feel sure that the acquisition of the revised easements would be facilitated if Plan A is adopted.
7. Operation of the Floodway under Plan A provides the same degree of protection for the project flood to Cairo and the lower reaches of the St. Louis and Louisville districts as is provided in the remainder of the mainline Mississippi River levees and in the event of a flood greater than the project flood, there is a probability of additional relief due to overtopping and natural crevasses.
8. In view of discussions above and in the report, and considering the infrequent occurrence of floods approaching the project design flood in magnitude I am convinced that the revised flowage easements should be obtained on the basis of confining the plan crevasses to the upper fuseplug section (Plan A). I therefore recommend approval of the District Engineer's report as submitted.
The recommendations and plan were approved by the Chief of Engineers on October 20, 1966 (plaintiffs' Exhibit "14").
8. In 1983, the Corps adopted its current plan. Unlike the original plan "A", referred to in the testimony as the 1966 plan, the later plan, identified as the 1983 plan, proposed crevassing outside of the upper fuseplug. Specifically, the 1983 plan established a scenario in which the upper fuseplug would be crevassed by explosions approximately equal to two hundred (200) to two hundred fifty (250) tons of TNT. The crevasses would be approximately seventeen thousand three hundred fifty (17,350) feet in length and eight (8) feet in depth in the upper fuseplug. Furthermore, the 1983 plan called for crevassing of what is referred to as the lower fuseplug in dimensions of approximately five thousand five hundred (5,500) feet in width and eight (8) feet in depth.
9. Plaintiff landowners apparently had little objection to the 1966 plan. They perceived the plan to crevasse the upper fuseplug as a fair exchange for the added protection of the raised levees and the purported concomitant reduction of the frequency of flooding. Plaintiffs object strenuously, however, to the 1983 plan which was adopted with little local input. The effect of the 1983 plan is to change the Floodway from what is essentially a reservoir, draining off some of the Mississippi River's flow, to the function of a diversion channel whereby the Floodway becomes a part of the Mississippi River. The distinction between the two functions that creates the concern among the plaintiffs is the greater amount of damage and scouring of the soil that will result from the increase in the velocity of the floodwaters when the Floodway is used as a diversion channel.[1] Thus, plaintiffs contend, and the Court believes, that had they been aware of the Corps' intention to crevasse the upper fuseplug, they would not have sold the modified easements to the Corps.
10. The testimony indicates that the procedure for adoption of the 1983 plan stands in sharp contrast to that of the 1966 plan. The 1966 plan of operation involved significant local input as reflected by the documents which eventually led to the formation and promulgation of Plan "A". The 1983 plan was adopted with almost no input from local interests. The Corps' failure to promulgate and disseminate this information and solicit local input is purportedly *511 explained by its belief that the 1983 plan was a mere modification of the 1966 plan. The Court cannot accept this contention, especially in light of the fact that the landowners within the Floodway specifically objected to the 1983 plan when it was proposed as an alternative in 1966.
11. The Court finds that the Corps has been guilty of affirmative misconduct in materially and substantially modifying its plan of operation by including two sections for crevassing outside the upper fuseplug section, when the Corps knew that the modified easements had been obtained based on the Corps' 1966 plan designed to avoid landowner objections. The Corps knew that the landowners strongly objected to the additional crevassing. Permitting the Corps to implement the 1983 plan, based on material changes in crevassing the levee, when it elected to avoid the plan in 1966 in order to induce landowners to sign the modified easements would be highly inequitable and would allow the Corps to obtain through affirmative misconduct what it knew it could not obtain voluntarily from the landowners.
12. The Court further finds that the adoption of the 1983 plan by the Corps was arbitrary and capricious and an abuse of discretion based on the following factors:
(a) The Mississippi basin model studies employed as a justification for adopting the plan predicts that a river stage of 67.1 feet would result if the lower crevasse were not used and 71.3 feet would result if the Floodway were not used at all. These river stages cannot occur because at that point, the fuseplug, the frontline levee, the Cairo levee and the setback levee would all be overtopped. In fact, the major body of land that comprises the Missouri bootheel, as well as portions of other states, would be submerged at these river stages.
Moreover, if these results are merely statistical evaluations in order to establish differentials of various test criteria, they are critically deficient as a method of determining the extent of flooding within a real world context. Despite the fact that the Corps has a physical model which may be used in analyzing project flood results, there apparently were no tests performed to determine the actual amount of flooding, in, for example, square acres, if the Floodway were not operated. The Corps simply derived its hypothetical Cairo gauge figure, which unquestionably could never occur, and determined the necessity for the 1983 plan from this.
(b) No tests were performed concerning the effect of the crevassing explosions, and the resulting displacement of a massive amount of water, into the Floodway, on the New Madrid fault during a time of major flooding. Although government witnesses testified that they had reviewed the problem in the course of preparing for trial, there were no efforts to conduct a study prior to the adoption of the 1983 plan. Moreover, although the government's experts indicated that they did not believe that the Corps' proposed activities could induce any seismic reaction within the New Madrid fault, there has not been, at this date, any in-depth research into the problem.
(c) Prior to the decision to implement the 1983 plan, the Corps had conducted a study concerning the possibility of upgrading the levees during a flood. This plan may have presented a viable alternative to crevassing the levee. However, the report was never presented to the decisionmaker, General Read.
(d) The Corps failed to make any study concerning the ability of the upper fuseplug to crevasse naturally during flood conditions.
(e) Colonel John Hatch, District Engineer of the Memphis District, displayed an amazing lack of knowledge concerning critical elements of both the 1966 plan and the 1983 plan. While the Court acknowledges that Colonel Hatch is not the decisionmaker, he is the line officer in charge of implementing the Corps' policies, administering its projects and making recommendations to the actual decisionmaker, General Read. Colonel Hatch's paucity of knowledge concerning *512 important aspects of the plan is, therefore, influential in establishing that the Corps has failed to consider all the relevant facts. Among other deficiencies, Colonel Hatch did not have any familiarity with the 1966 plan, including its damage estimates and the original four alternative proposals, as well as the reasons why plan "A" was adopted; he made no new damage estimate for the 1983 plan; he was unaware of the draft study to consider raising the levees on an emergency basis; he apparently labored under the misapprehension that his predecessor had notified local interests of the plan change when, in fact, his predecessor had not; and he could not articulate a reason for the plan change other than the vague assertion that there had been an "informal study" at some point.
In conclusion, the government's witnesses succeeded in impressing this Court only with their callous indifference to the fears and concerns of local interests regarding the destruction of their homes by flood or earthquake, and their almost total inability to explain why this plan had been chosen among other alternatives.
13. The Court further finds that any plan to crevasse the Floodway retains serious deficiencies in terms of rational explanation. Testimony elicited from the Corps' own experts reveals that statistically, the project flood may be expected to occur once every two hundred (200) years. However, the Floodway is expected to be operated, statistically, once every eighty (80) years. Moreover, the current plan calls for the Corps to begin mechanically degrading the levee with heavy machinery at 51.5 feet, approximately 6.5 feet before the authorized crevassing at 58 feet. This can be expected to occur every seven (7) years. The cost of this degrading process is approximately Two Million Five Hundred Thousand Dollars ($2,500,000). Thus, the Corps would spend Twenty Seven Million Five Hundred Thousand Dollars ($27,500,000) over an eighty (80) year period to operate the floodway while, according to a draft report, they would spend One Million Five Hundred Thousand Dollars ($1,500,000) to strengthen the levee every eighty (80) years and still avoid flooding the landowners in the Floodway. It is difficult to see how a plan such as this could be considered anything but arbitrary, capricious and an abuse of discretion.

Conclusions of Law
This Court finds that it has jurisdiction in this cause by virtue of 28 U.S.C. § 1331. Title 5 U.S.C. § 702 states, in pertinent part:
A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.
It has been held that this section of the APA does not create an implied grant of subject matter jurisdiction. See Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1976). However, when read in conjunction with the 1976 amendment to Title 28 U.S.C. § 1331(a), which deleted the jurisdictional requirement that there be Ten Thousand Dollars in controversy, it is clear that judicial review of an agency action is proper. Id.
It is beyond controversy that the Army Corps of Engineers, as representative of the United States Army, is an agency within the meaning of Title 5, U.S.C. § 551. The term "agency" under the APA is broadly defined as "each authority of the government of the United States, whether or not it is within or subject to review by another agency....", except for certain specified exemptions, none of which are applicable in this instance. Moreover, military departments have been reviewed within the context of general agency analysis in a number of situations. See, e.g. Mead Data Central, Inc. v. U.S. Dept. of Air Force, 566 F.2d 242 (D.C.1977); State of Missouri ex rel Ashcroft v. Dept. of Army, 526 F.Supp. 660 (W.D.Mo.1980), aff'd 672 F.2d 1297 (8th Cir.1982). Ashcroft, in fact, specifically dealt with the United States Army Corps of Engineers in terms of agency analysis. 672 F.2d at 1299.
*513 The government, in both its pretrial and posttrial briefs, has argued strenuously that the Court's jurisdiction in this cause is precluded by the decision of Oklahoma v. Atkinson, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1940). Atkinson involved construction of the Denison Reservoir on the Red River pursuant to the Act of June 28, 1938. The Atkinson court ruled that the decision to construct the reservoir was essentially one of policy and, as such, should be reserved for the Congress, not the courts.
The Court cannot agree that Atkinson precludes judicial review. First, the Atkinson court was faced with a specific act authorizing the construction of the Denison Reservoir. In contrast, the extent of the congressional authorization in the present cause is substantially less certain. The Corps bases its authorization to crevasse the fuseplugs on the Flood Control Act of 1965. As set out in the findings of fact, supra, the Flood Control Act of 1965 adopted "substantially as recommended" the projects and plans of the Chief of Engineers as reflected in House Document 308. House Document 308 is a six-volume study reviewing a variety of projects in the Mississippi River basin. The portion of House Document 308, from which the Corps apparently draws its congressional authority, is found under the heading "Possible Methods of Improvement" and fails to provide more than vague guidelines concerning upgrading of the levee system and implementation of a plan to artificially crevasse the levee. See House Document 308, Eighty Eighth Congress, p. 57.
This reference hardly rises to the level of a specific congressional act, as was the case in Atkinson. In sum, the Court cannot believe that a reference to a possible method of improvement, contained in a six-volume study, adopted "substantially as recommended" rises to the level of congressional authorization so as to preclude judicial review of an agency's action.
Second, Atkinson was decided in 1940, prior to the adoption of the Administrative Procedure Act. Judicial review of agency actions, as developed in the case law construing the provisions of the APA, has been given a liberal scope. As noted in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1966), the right to judicial review may be restricted "only upon a showing of `clear and convincing evidence' of a contrary legislative intent...." Id. at 141, 87 S.Ct. at 1511, quoting Rusk v. Cort, 369 U.S. 367, 379-80, 82 S.Ct. 787, 794-95, 7 L.Ed.2d 809 (1961). The parties have not cited, nor can the Court find, any evidence that Congress intended to restrict judicial review in this area. There was certainly not clear and convincing evidence that Congress intended to restrict such review.
Finally, the Court notes that a number of other courts have reviewed projects undertaken by the Corps. See, e.g., Sierra Club v. U.S. Army Corps of Engineers, 701 F.2d 1011 (2nd Cir.1983); Creppel v. U.S. Army Corps of Engineers, 670 F.2d 564 (5th Cir.1982); Allain-Lebreton v. U.S. Army Corps of Engineers, 670 F.2d 43 (5th Cir.1982); Taylor v. U.S. Army Corps of Engineers, 567 F.2d 1332 (5th Cir.1978). Thus, judicial review of Corps actions appears to be a well-worn path among the courts.
Having established that jurisdiction over this cause is valid, the Court must now determine the proper scope of judicial review. The scope of review of agency action is found in 5 U.S.C. § 706 which states in pertinent part:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency. The reviewing court shall  (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
* * * * * *

*514 (D) without observation of procedure required by law;
Under the "arbitrary, capricious" standard the scope of review is a narrow one. The reviewing court must:
Consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [citations omitted]. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.
Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1970). The agency must articulate a "rational choice between the facts found and the choice made." Burlington Truck Lines v. U.S., 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).
In determining whether proper procedures have been followed by the agency, this Court is mindful that absent constitutional constraints or extremely compelling circumstances, administrative agencies should be free to fashion their rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their very duties, subject to the statutory requirements of the Administrative Procedure Act. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel, Inc., 435 U.S. 519, 545, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978).
The standard of review thus defined, the Court now turns to a full review of the cause. Before determining the substantive merits of the cause, however, the Court must determine whether proper procedural requirements have been followed as required in 5 U.S.C. § 706. As a prerequisite to determining the proper procedural safeguards, the nature of the Corps' action must be discerned. Within this context, it is clear that the Corps' decision to adopt the 1983 plan was a rulemaking decision as defined under 5 U.S.C. § 551(4). This section defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...."
In adopting a rule, an agency is compelled to follow the requirements set forth in 5 U.S.C. § 553 which states, in part:
(b) General notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include  (1) a statement of the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except when notice or hearing is required by statute, this subsection does not apply  (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) the notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest;
(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views or arguments with or without opportunity for oral presentation.
Failure to follow the procedural requirements of the APA invalidates an agency rule. See United States v. Gavrilovic, 551 F.2d 1099 (8th Cir.1977); Hartnett v. Cleland, 434 F.Supp. 18 (D.C.S.C. 1977). Furthermore, providing the opportunity to comment after promulgation of a rule cannot substitute for notice and an opportunity to comment beforehand. Mobil Oil Corp. v. Department of Energy, 610 F.2d 796, n. 4 (E.M.App.1979), cert. *515 denied 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790; Sharon Steel Corp. v. Environmental Protection Agency, 597 F.2d 377 (3rd Cir.1979). The Court finds that the agency's adoption of the 1983 plan is a substantive rule, vitally affecting the rights of a large number of individuals, and not within any exemption of § 553.
As far as this Court can determine, however, the Corps did not fulfill any of the necessary requirements in adopting the 1983 plan. The plan was not set out in the Federal Register, nor were the interested persons given an opportunity to participate in the rulemaking decision. At most, they were simply advised of the decision. The Corps apparently believed that no notice or comment was necessary because the 1983 plan was a mere "modification" of the 1966 plan. (Tr. 5-49). However, this modification was one which the affected individuals strongly objected to when first proposed. To allow the Corps' to adopt the later plan as a "modification" of the previously adopted plan would also allow the Corps to evade and avoid the spirit of the APA. The Court cannot countenance such a result.
Assuming, arguendo, that the 1983 plan was properly promulgated and adopted, there exists significant substantive defects in its construction. First, the original plan, as authorized specifically set out certain conditions, as stated in Finding of Fact number 3. These conditions have not been met to the extent that the Corps has not obtained all the necessary flowage easements or the save and hold harmless clauses. Thus, the conditions expressly stipulated in the authorizing legislation have not been achieved and, for that reason alone, neither the 1966 plan nor the 1983 plan may be validly implemented.
Second, the Court has found that the Corps' plan to operate the Floodway is arbitrary, capricious and an abuse of discretion in that it failed to consider the necessary relevant factors. The genesis of the Corps' failure in this regard is apparently derived from its belief that congressional authorization to crevasse the Floodway, as stated in House Document 308, is equivalent to a congressional mandate to operate the Floodway. Perhaps the best example of this attitude is found in the cross-examination of Colonel John Hatch, District Engineer for the Memphis District. When apprised of a draft plan[2] for raising the levee system during a flood emergency, the Colonel made the following comments:
Q Is it a fair statement to say, Colonel, that you are not then going to consider any plan that would raise the grade of the deficient levees and floodwalls insofar as it might relate to your decision to artificially crevasse these levees?
A That's true.
Q You feel like that you are obligated by the Corps' plan and the Act of Congress to operate this Floodway without regards to the feasibility of temporarily raising the floodwalls sufficient to pass the project flood?
A Given current authorization and law, yes.
Q You don't feel that the Corps has any discretion to fight the project flood by raising the floodwalls and levees sufficient to pass the project flood?
A I do not.
*516 This attitude explains why the Corps has failed to initiate appropriate studies, but it does not excuse this failure. The Corps, of course, has an obligation to perform its duties in order to benefit the greatest number of people and to provide the best flood protection possible. However, § 706 expressly states that it is the function of the reviewing court to interpret constitutional and statutory provisions. In fulfilling its obligation under § 706, this Court must conclude that the Corps' belief that it must operate the Floodway is inaccurate. Crevassing the fuseplugs of the Floodway represents only one course of conduct, albeit recognized by Congress, among many others which were apparently not even considered. Moreover, from testimony elicited at trial, crevassing the Floodway does not appear to be a particularly efficient course of conduct. Hence, this Court is compelled to enjoin the Corps' proposed plan of operation.
Plaintiffs have alleged, and this Court agrees, that defendants' activities in the course of obtaining the modified easements rises to the level of affirmative misconduct. As stated in the findings of fact, this allegation accrues from the government's adoption of the 1966 plan, because of the landowners' objections to crevassing the lower fuseplug, the acquisition of modified easements based on that plan, and the subsequent adoption of the 1983 plan allowing crevassing of the lower fuseplugs.
The case law in governmental estoppel, especially when affirmative misconduct is alleged, is unsettled. A leading case in this regard is Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In this case, the United States Supreme Court ruled that incorrect information supplied to an individual by the Federal Crop Insurance Corporation was not binding upon the corporation. However, the Merrill court explicitly stated that a critical factor in the decision was the fact that the pertinent wheat regulations had been published in the Federal Register, which put the plaintiff on notice that he was not, in fact, insured. "Accordingly, the wheat crop insurance regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the regulations or the hardship resulting from innocent ignorance." 332 U.S. at 385, 68 S.Ct. at 3. As previously noted, the Corps has failed to provide this type of statutory notice. Thus, Merrill is distinguishable on its facts.
Moreover, Merrill did not involve affirmative misconduct. In fact, the Supreme Court has left open the question of affirmative misconduct and its effect on governmental estoppel. See Montana v. Kennedy, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1960); United States Immigration and Naturalization Service v. Hibi, 414 U.S. 5, 8-9, 94 S.Ct. 19, 21-22, 38 L.Ed.2d 7 (1973).
There is also a dearth of caselaw in this area among the Circuit Courts of Appeals. The Eighth Circuit has applied the Merrill rule in a number of cases. See, e.g., Leinbach v. Califano, 596 F.2d 300 (8th Cir. 1979); Werner v. Department of Interior, 581 F.2d 168 (8th Cir.1978); United States v. One 1973 Buick Riveria Auto, 560 F.2d 897, 899 (8th Cir.1977); United States v. Crance, 341 F.2d 161, 166 (8th Cir.1965), cert. denied 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63. However, these cases involved fact situations which did not rise to the level of affirmative misconduct. In Free Enterprise Canoe Renters Association v. Watt, 711 F.2d 852 (8th Cir.1983), the court stated:

In the absence of affirmative misconduct, the government may not normally be estopped by representations or misinformation given by its agents." (emphasis supplied).
Id. at 857. The natural and reasonable inference from this statement is that when affirmative misconduct is alleged and proved, as here, governmental estoppel is a proper result.
The Ninth Circuit has followed a different path. Employing the analysis of Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1950), the Ninth Circuit has *517 held that the government may be estopped if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel. See United States v. Wharton, 514 F.2d 406 (9th Cir.1975); United States v. Lazy FC Ranch, 481 F.2d 985 (9th Cir.1973). Under this analysis, it is clear that the Corps should be estopped from implementing the 1983 plan because the additional damage to plaintiffs' property coupled with the government's duplicitous conduct, would work a serious injustice upon the plaintiffs and the public interest would not be unduly damaged if the government were estopped because, as described supra, the plan is seriously deficient.
In conclusion, the Court has found that the Corp's plan to operate the Birds Point-New Madrid Floodway is arbitrary and capricious and an abuse of discretion because it did not consider relevant factors such as alternative methods of flood protection. Therefore, the Corps should be enjoined from implementing either the 1966 or the 1983 plans. Second, the Court has found that the statutory requirements in House Documents 308 have not been fulfilled which also precludes implementation of either the 1966 or 1983 plans. Third, the Court finds that the procedural requirements of the APA, including allowing interested persons notice and an opportunity to be heard, have not been followed with regard to the 1983 plan. Therefore, this plan is invalid and may not be implemented. Finally, the Court finds that the Corps acted with affirmative misconduct in procuring the modified easements on the basis of the 1966 plan and subsequently attempting to implement the 1983 plan. Therefore, the government should be barred from implementing the 1983 plan.
The granting of a permanent injunction in this action also disposes of the condemnation actions. The government's request for condemnation is denied. Should condemnation later be granted in a further proceeding, the Court assesses damages in the same amount provided in the original order of May 10, 1983.
NOTES
[1] The government's expert testified in this regard that the flow of water through the Floodway would average approximately two feet per second. This rate is slightly more than one mile an hour and, as such, would not severely damage the property in the Floodway. The Court realizes that the credentials and qualifications of an expert witness make that witness far more adept at evaluating the data and arriving at a conclusion. However, expert testimony is not conclusive and the Court is compelled to weigh the credibility of all testimony presented. In this case, the Court finds it difficult to believe that the Floodway, acting as a diversion channel for the Mississippi River during a major flood, would have an average water flow of only slightly more than one mile per hour.
[2] The government objected to the introduction of this document on the basis of 5 U.S.C. § 552(b)(5), which provides an evidentiary privilege for inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. The government relied on E.P.A. v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1972) for support of its position. However, Mink specifically allows disclosure of purely factual data. It is the opinion of this Court that the report in question is purely factual in nature.

Moreover, it cannot be ignored that the Mink decision itself was criticized by Congress for its broad interpretation of the Executive Order exemption and Congress has responded by amending the Act to narrow the exemptions contained therein. See Phillippi v. Central Intelligence Agency, 546 F.2d 1009, n. 4 (D.C.Cir.1976). Thus, it is clear that there is a strong congressional policy to restrict an agency's ability to withhold information